53 P.3d 277

### CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Petitioner–Appellee,

v.

### Jane DOE, Defendant–Appellant,

and

### Jane Roe and John Roe, Defendants–Appellees.

### No. 23053.

Intermediate Court of Appeals of Hawai'i.

April 25, 2002.

Certiorari Granted June 7, 2002.

Ninia Stacia Parks for defendant-appellant (defendant-appellant, pro se, on the opening brief; and Nathan R. Brenner and Chris P. Bertelmann (law offices of Nathan R. Brenner) on the reply brief).

Rosemary McShane, Deputy Corporation Counsel, City and County of Honolulu, for petitioner-appellee (Mark G.S. Au and Amy

Murakami, Deputies Corporation Counsel, with her on the brief).

John C. McLaren (Park Park Yu & Remillard) for defendants-appellees Lloyd Y. Asato, Special Administrator for the Estate of John Roe, Deceased, and Jane Roe (Arthur Y. Park and Laurent J. Remillard, Jr. with him on the brief).

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

The dispositive issue in this appeal[1] is whether the Family Court of the First Circuit (the first circuit family court) abused its discretion when it denied a motion by Defendant–Appellant Jane Doe (Grandmother) that sought, among other relief, to: (1) set aside the paternity judgment (the Paternity Judgment) that determined, based on genetic test results stipulated into evidence by the parties, that her deceased son (Putative Father) was the biological father of Daughter, a child born to Defendant–Appellee Jane Roe (Mother) after Putative Father's death; (2) allow, based on newly discovered evidence, further discovery into the circumstances under which Putative Father's blood had been drawn for the genetic test; and (3) set the case for trial on the merits of the paternity issue.

The first circuit family court refused to set aside the Paternity Judgment, determining that even if there were problems with the

1. Defendant–Appellant Jane Doe (Grandmother) also appeals from the December 9, 1997 judgment that established her son (Putative Father) as the biological father of Daughter (the Paternity Judgment), and the October 16, 1997 "(Stipulated) Order Regarding Genetic Testing" (the Genetic Testing Order). However, inasmuch as Grandmother's appeal was filed on December 20, 1999, more than two years after the entry of the Paternity Judgment and the Genetic Testing Order, Grandmother's appeal from the Paternity Judgment and Genetic Testing Order is untimely.

2. Although the Petition for Paternity filed by Petitioner Appellee Child Support Enforcement Agency, State of Hawai'i (CSEA) alleged that Grandmother is Putative Father's "mother and executor of his estate," the record on appeal suggests that Grandmother was not the executor of Putative Father's estate. Instead, the record reflects that on December 20, 1996, an order was

genetic testing of Putative Father, Mother's oral statement that Putative Father was Daughter's biological father was sufficient evidence, in and of itself, to establish Putative Father's paternity. We conclude that the first circuit family court's denial of Grandmother's motion was based on an erroneous legal ruling. Accordingly, we vacate the order denying Grandmother's motion and remand this case for further proceedings consistent with this opinion.

BACKGROUND

A. *The Original Paternity Action*

On August 23, 1996, Putative Father died as a result of massive injuries he sustained in a multi-vehicle accident on the island of Hawai'i. On November 18, 1996, Mother gave birth to Daughter in Honolulu on the island of O'ahu. On July 2, 1997, the State of Hawai'i Child Support Enforcement Agency (CSEA) filed a Petition for Paternity in the first circuit family court, seeking to establish that Putative Father was Daughter's biological father and requesting that the "care, custody, and control of" Daughter be granted to Mother. The petition named Mother and Putative Father as defendants in the lawsuit, along with Grandmother, who was alleged in the petition to be Putative Father's mother and the "executor" of Putative Father's estate.[2]

Following an August 1, 1997 hearing, the

entered by the third circuit court, appointing Grandmother as the legal representative of Putative Father's estate, with authority to "collect the no-fault benefits to which [Putative Father's] estate [was] entitled" and to "distribute said proceeds to or for the benefit of [Grandmother and Putative Father's father [ (Grandfather) ] ... (collectively, Grandparents)]." The record also indicates that on July 22, 1997, the third circuit court entered an order appointing Grandmother as Special Administrator of Putative Father's estate to bring and prosecute a wrongful death and/or survival action on behalf of Putative Father's estate, and receive and retain proceeds in connection with a settlement or judgment. On October 8, 1999, however, the third circuit court appointed Defendant–Appellee Lloyd Y. Asato, the Special Guardian of the property of Daughter, to "replace" Grandmother as Special Administrator of Putative Father's estate.

parties [3] agreed that genetic tests would be conducted to determine the paternity issue. Although blood and tissue samples were readily available from Mother and Daughter, it was not known at the time of the hearing whether any body tissue or fluids from Putative Father existed. On August 8, 1997, a "(Stipulated) Order Regarding Genetic Testing" was filed, which ordered, among other things, that: (1) if available, "[t]issue samples" of Putative Father shall be genetically tested; (2) Mother and Daughter shall submit to genetic testing; and (3) the results of the testing and the computation of probability statistics "shall be received into evidence at the trial ... without the need to lay a foundation, subject to the reservation by any party to call witnesses regarding the weight of evidence to be assigned or the procedures employed in conducting said tests[,]" provided the party calling the witnesses gives two weeks' notification to opposing counsel.

Subsequently, a blood sample from Putative Father was reportedly located at Hilo Hospital, and the parties stipulated [4] "that the blood sample of [Putative Father] held by Hilo Hospital shall be released to Laboratory Corporation of America, Inc. [ (the laboratory) ] for the previously ordered genetic testing[.]" The record on appeal does not indicate whether Hilo Hospital received a copy of the stipulation or any other authorization to release the blood sample. Additionally, there is no chain-of-custody documentation in the record regarding: (1) the circumstances under which Putative Father's blood sample was obtained, (2) who collected the blood sample, (3) who transmitted the blood sample to the laboratory, and (4) how the blood sample was transmitted to the laboratory.[5]

Pursuant to Hawaii Revised Statutes (HRS) § 584–11 (Supp.2001), which is part of Hawai'i's Uniform Parentage Act, HRS chapter 584, genetic testing utilized in proceedings to determine paternity "must have a power of exclusion greater than ninety-nine point zero per cent (99.0%) and a minimum combined paternity index of five hundred to one, and shall be performed by an expert qualified as an examiner of genetic markers, appointed by the court."

According to the genetic test results filed in the first circuit family court on November 18, 1997, Mother's and Daughter's blood samples were drawn on October 16, 1997, and Putative Father's blood sample was drawn on August 27, 1996. Additionally, the test results: (1) revealed a combined paternity index [6] of 2,542 to 1; (2) concluded that

---

3. Present at the hearing were: Defendant–Appellee Jane Roe, Daughter's mother (Mother); Deputy Corporation Counsel Rosemary McShane, CSEA's counsel; Thomas D. Farrell, the attorney for Putative Father's estate; and Grandparents.

4. Signing the stipulation were Mother, the attorney for Putative Father's estate, Grandmother, Grandfather, and a deputy corporation counsel representing CSEA (CSEA's counsel).

5. During oral arguments, CSEA's counsel stated that although genetic test results are routinely filed in the paternity case files, the documents establishing the chain of custody of the body fluids or tissue samples genetically tested are not made a part of the paternity case files but are kept by her office. Because the reliability of genetic test results to prove paternity depends on the reliability of the chain of custody of the specimens genetically tested, we highly recommend that the chain of custody evidence be filed as part of the record in any paternity action. Although Hawai'i has not enacted the 2000 version of the Uniform Parentage Act (UPA), 9B Uniform Laws Annotated 295 (2001), we believe it instructive that section 504 of the UPA (2000) sets forth specific requirements for a report of genetic testing to be self-authenticating in a court proceeding:

**Report of Genetic Testing.**
(a) A report of genetic testing must be in a record and signed under penalty of perjury by a designee of the testing laboratory. A report made under the requirements of this [article] is self-authenticating.
(b) Documentation from the testing laboratory of the following information is sufficient to establish a reliable chain of custody that allows the results of genetic testing to be admissible without testimony:
  (1) the names and photographs of the individuals whose specimens have been taken;
  (2) the names of the individuals who collected the specimens;
  (3) the places and dates the specimens were collected;
  (4) the names of the individuals who received the specimens in the testing laboratory; and
  (5) the dates the specimens were received.
(Bracketed material in original.)

6. The term "paternity index" has been defined as follows:

Putative Father "cannot be excluded as the biological father of [Daughter], since they share genetic markers"; and (3) determined that "the probability of [Putative Father's] paternity is 99.96%, as compared to an untested, unrelated man."

The Affidavit of Genetic Testing Expert signed by Ruth P. Koester, Ph.D. (Dr. Koester) and attached to the test results did not contain a "chain of custody" recital regarding precisely how, when, and by whom the blood samples were received at the laboratory. Dr. Koester's affidavit declared only that "[s]pecimens were tested from [Mother], [Daughter], and [Putative Father,]" "[t]he samples were delivered to the laboratory by courier[,]" and "[u]pon receipt, all specimens were examined, found to be intact, were logged in, were assigned a unique identification number, and were taken to work stations for testing."

At a December 4, 1997 hearing held after the genetic test results were returned, First Circuit District Family Court Judge Darryl Choy (Judge Choy) and Mother engaged in the following dialogue:

THE COURT: Okay.

You understand the petition claims that you have a child named [Daughter] and that [Putative Father] is the father?

[MOTHER]: Yes.

THE COURT: Okay.

You dispute this at all?

[MOTHER]: Oh, no.

THE COURT: You knew that [Putative Father] was the father of your child?

[MOTHER]: Oh, yeah.

THE COURT: Okay. So this just confirms the-the paternity then.

---

The ratio between the chance that an alleged father may pass the obligatory gene to his offspring, compared the [sic] the chance that a random man may pass the obligatory gene to his offspring. It is sometimes referred to as the "genetic odds in favor of paternity," given the genetic findings in the mother, child, and alleged father. PI=x/y.

1 N. Vitek, *Disputed Paternity Proceedings*, App. 13B at 13–109 (5th ed.2001).

An "obligatory gene" is "[a] gene which must have come from the disputed parent, in view of the child's and other parent's genetic makeup." *Id.*

---

All right. So, you don't wish to invoke your right to have a trial or to have an attorney regarding whether or not [Putative Father] is the father of your child?

[MOTHER]: Oh, no. The—the—his parents are the ones that saying that it's not his child.

THE COURT: Okay. Very well.

I just want to be certain because you're still named as a defendant in this case.

The first circuit family court thereafter engaged in the following dialogue with Thomas D. Farrell (Farrell or Mr. Farrell), who represented that he was the attorney for Grandmother, in her capacity as "executor" of Putative Father's estate:

THE COURT: ... Now, Mr. Farrell, regarding the 99.96 percentile? ... [Y]ou're the attorney for the estate.

MR. FARRELL: That's correct, your Honor.

THE COURT: The estate is no longer contesting the question of paternity?

MR. FARRELL: The estate no longer contests the question of paternity.

As a small technical matter, your Honor, I would—

THE COURT: Sure. Go ahead.

MR. FARRELL:—note that [Grandmother] is named as a Defendant. And I assume that is only in her capacity as the personal representative of the estate.

THE COURT: ... [Y]eah. I think so. It is—[Grandmother] is [Putative Father's] mother and executor of estate. I think it's only in that capacity.

MR. FARRELL: All right, your Honor.

THE COURT: Okay.

---

A "combined paternity index" has been defined as follows:

Likelihood that the alleged father (or a man that is genetically identical to the alleged, father) contributed the paternal genes to a child, divided by the likelihood that another unrelated man of the same race contributed the paternal genes. This is calculated as the product of the paternity indices for each individual system tested.

*Id.* at 13–104.

MR. FARRELL: With—with that understanding and—and on behalf of the estate—and I've talked to my client, I've provided her with a copy of the DNA [ (deoxyribonucleic acid) ] testing results.[7] You know, we have no basis at this point to contest paternity.

THE COURT: Very well.

This [c]ourt will then adjudicate the decedent, [Putative Father], as the biological father of [Daughter]. Order that his name be placed on the birth certificate.

(Footnote added.)

On December 9, 1997, Judge Choy entered a judgment decreeing that Putative Father is Daughter's biological father and directing that the State of Hawai'i, Department of Health "prepare a new Certificate of Live Birth for [Daughter] inserting [Putative Father's] name thereon as the father."

B. *The Honolulu Advertiser Article and Grandmother's Subsequent Investigation*

On August 29, 1999, an article about a just-completed criminal trial of a suspect accused of raping and murdering Dana Ireland (Ireland) appeared on the front page of *The Honolulu Advertiser*. Entitled "Is suspect missing in Ireland case?[,]" the article stated, in pertinent part:

> While many people [in Hilo, Hawai'i] talked of "closure" with the conviction of Franklin Pauline Jr. [ (Pauline) ] on Friday for the murder of [Ireland], the guilty verdicts did not resolve some of the questions that continue to surround one of [Hawai'i's] most terrible crimes.
>
> One of the most troubling is the question raised by the jury after it convicted Pauline: Was there a fourth person involved in Ireland's 1991 rape and murder?
>
> The potential fourth suspect has remained an elusive figure throughout the investigation. Even before the trial, the possibility of a fourth suspect was raised after DNA from sperm samples taken from a hospital sheet in which Ireland lay

was determined not to match Pauline or the other two suspects, Albert Ian Schweitzer and Shawn Schweitzer.

> Pauline even implied in his testimony that there was another person, but said he never identified him to police because he was "holding my aces."
>
> As he questioned Pauline in court last Monday, deputy prosecutor Lincoln Ashida [ (Ashida) ] mentioned the name [of Putative Father].
>
> Almost as soon as Ashida uttered the name, defense attorney Clifford Hunt objected. Both attorneys were summoned to Judge Riki May Amano's [ (Judge Amano) ] bench, and after a brief discussion, [Judge] Amano declined to allow any further questioning about [Putative Father].
>
> The 23–year–old Hawaiian Beaches resident died in a car crash on Aug. 23, 1996. An artist and carpenter, he lived near Pauline and the Schweitzer brothers.
>
> According to people familiar with the case, a tissue sample was taken from [Putative Father's] body and its DNA analyzed to determine whether it matched the semen on the hospital sheets.
>
> An expert testified only that tissue from a cadaver—she didn't say whose—had been obtained but that it couldn't be tested because it had been ruined by the formaldehyde used to preserve it.
>
> [Putative Father's] body was cremated and the ashes scattered, so another sample couldn't be obtained.

The article mentioned several other incidents which supported the notion that there were four suspects involved in the rape and murder of Ireland. Additionally, the article quoted the jury foreperson for the just-completed trial as saying:

> The DNA was hard for us, because it was a very technical subject[.] ... We obviously believe there was another person involved. Unfortunately, we don't know who. That's certainly going to be something that's going to have to be continued.

---

7. It is not clear to this court whether Grandmother was ever shown a copy of the chain-of-custody records for the blood genetically tested, or whether she only saw a copy of the genetic test results.

The article prompted Grandmother to initiate an informal investigation to ascertain the source of the blood sample used to genetically test Putative Father and determine his probable paternity of Daughter. Based on her findings, Grandmother, *pro se*, filed a motion on October 19, 1999 to set aside the Paternity Judgment. Grandmother's motion was brought pursuant to Rule 60(b)(2) and (3) of the Hawai'i Rules of Civil Procedure (HRCP),[8] Rules of the Circuit Courts of the State of Hawai'i,[9] Federal Rules of Civil Procedure (FRCP),[10] and Hawai'i Family Court Rules (HFCR). Since this case was filed in the first circuit family court and is, thus, subject to the HFCR, we will treat Grandmother's motion as filed pursuant to HFCR Rule 60(b)(2) and (3), which, at the time, provided, in pertinent part, as follows:

> **Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from any or all of the provisions of a final decree, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under

Rule 59(d)(2); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; .... The motion shall be made within a reasonable time, and for reasons ... (2), and (3) not more than one year after the decree.

In support of her motion, Grandmother mentioned the following "newly discovered evidence" that she claimed to have uncovered in her investigation [11]:

> (7) The Honolulu Advertiser, August 29, 1999, reported that the tissue samples taken from [Putative Father's] cadaver was ruined by formaldehyde and couldn't be tested by DNA experts as the body was cremated so another sample could not be obtained, (Exhibit 3).

> (8) The Laboratory Report *dated August 27, 1996* and made part of the autopsy report indicates that the blood specimen *drawn was for comprehensive drug screening* and *no other report found or record [sic] for additional blood draw[n], (Exhibit 4)*.

---

8.  At the time Grandmother filed her motion to set aside the Paternity Judgment, Hawai'i Rules of Civil Procedure Rule 60(b)(2) and (3) provided, in relevant part, as follows:
    **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: .. (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.

9.  There is no Rule 60(b)(2) and (3) that is part of the Rules of the Circuit Courts of the State of Hawai'i.

10.  Federal Rules of Civil Procedure Rule 60(b)(2) and (3) provides as follows:

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; .... The motion shall be made within a reasonable time, and for reasons ... (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. ...

11.  The numbers in parentheses appear in Grandmother's motion and correspond to the numbered paragraphs of the motion. The exhibits referred to in parentheses were referred to in Grandmother's motion and include the letters, reports, etc. that Grandmother sent or received as part of her investigation and raised questions regarding the origin of the blood sample allegedly used in the genetic testing of Putative Father.

(9) On September 7, 1999, [Grandmother] sent a letter to Dr. Randall Baselt [ (Dr. Baselt) ] who received [Putative Father's] blood specimen on August 30, 1996 for a comprehensive drug screening asking if any blood samples of [Putative Father] was available after September 11, 1997, (Exhibit 5). On September 13, 1999, [Grandmother] received a telephone call from Robert Torres [ (Mr. Torres) ], assistant to Dr. Baselt, who said he was certain that the blood samples of [Putative Father] was discarded through the Medical Waste Company some time late May of 1997, (Exhibit 6), and further stated, he was not able to send a letter to confirm above unless speaking with Dr. Baselt first.

On September 20, 1999, [Grandmother] sent a letter to Dr. Baselt regarding the telephone call with his assistant, [Mr. Torres], who recalls [Putative Father's] blood specimen was destroyed in late May of 1997, no other response to date to challenge or correct any information given by Mr. Torres.

(10) On September 7, 1999, [Grandmother] met with Gail Carter [ (Ms. Carter) ] at Hilo Laboratories located in Hilo Medical Center and asked if there were any blood and/or tissue samples of [Putative Father] held in their laboratory. Ms. Carter stated that it is normal procedures if a body is involved in a fatal accident the police department would request blood sample be drawn for drug screening aside of that request no other blood would be drawn. Ms. Carter said once the blood sample is drawn for drug screening and sent, there would be none left in their possession and referred [Grandmother] to Hilo Medical Records and [Hilo] Police Department.

On September 20, 1999, [Grandmother] sent a letter to Ms. Carter confirming that there was no blood and/or tissue samples held beyond August 27, 1996 and no copy of court order requesting "blood samples" released for paternity testing found in

their files. No response returned by Ms. Carter correcting any information provided by her, (Exhibit 7).

(11) On September 7, 1999, [Grandmother] visited Hilo Medical Center and spoke with June Y. Daimaru [ (Ms. Daimaru) ], Medical Records Department, who with [Grandmother] reviewed [Putative Father's] entire medical file found no consent form or court order authorizing release of [Putative Father's] tissue and/or blood samples for genetic test a letter dated September 9, 1999 from Ms. Daimaru also confirms that there are no records dating beyond August 28, 1996 in their files at which time [Putative Father's] cadaver was released to the mortuary, (Exhibit 8).

(12) On September 16, 1999, [Grandmother] met with Edwin Tanaka [ (Mr. Tanaka) ] of Hilo Police Department to discuss the statements made in the Honolulu newspaper (see Exhibit 3) regarding on [sic] "tissue samples" taken from [Putative Father's] cadaver and if any request made for additional blood samples drawn and held for later. Mr. Tanaka informs [Grandmother] that all request for testing being done would have to come through police department and anything else would be by Court Order in [Putative Father's] case report shows blood samples drawn only for drug screening and is in the Autopsy Report.

No other request made for blood samples to be drawn. On September 20, 1999, [Grandmother] sent Mr. Tanaka a letter confirming meeting held September 16, 1999 to confirm that the only blood sample drawn from [Putative Father's] cadaver was sent for drug screening, (Exhibit 10).

(13) On September 20, 1999, [Grandmother] wrote to [Dr. Koester] who was [sic] performed the genetic test using [Putative Father's] blood samples drawn on August 27, 1996 that found [Putative Father] to be the alleged father of [Daughter], and requested the name of person who sent them

[Putative Father's] blood samples, [(]Exhibit 11). [Grandmother] received no reply to date.

(14) On September 20, 1999, [Grandmother] wrote a letter to Dr. Kanthi Von Guenthner [(Dr. Von Guenthner)] who did the autopsy on [Putative Father's] cadaver asking if there were any blood and/or tissue specimen taken for any other reasons, (Exhibit 12). Dr. Von Guenthner's reply was "they" have no blood specimen on [Putative Father], letter dated October 5, 1999, (Exhibit 12).

(Emphases in original.) In an affidavit attached to her motion, Grandmother attested that she had personally met with, spoken over the telephone with, and written to various individuals regarding Putative Father's blood samples. Attached to Grandmother's affidavit were copies of various letters that she had sent or received as part of her investigation into the source of Putative Father's blood sample for genetic testing purposes. Among the attached correspondence was a letter that Grandmother had sent to the deputy corporation counsel representing CSEA (CSEA's counsel), informing CSEA's counsel of *The Honolulu Advertiser* article and asking "to see your paper correspondence regarding this matter." By a letter dated September 20, 1999, CSEA's counsel refused Grandmother's request, stating, "[T]his case was concluded upon filing of the judgment on December 9, 1997. Therefore, the only documents that my office can release to you at this time are the documents filed in the paternity case and were provided to you through your attorney, [Farrell]."

## C. The Hearing on Grandmother's Motion to Set Aside the Paternity Judgment

On October 28, 1999, a hearing on Grandmother's motion to set aside the Paternity Judgment was held before the first circuit family court.[12] Farrell, representing Grandmother, recapped the previous history of the paternity case and stated that Grandmother had agreed to the genetic testing of Putative Father, in reliance on the representations of

CSEA's counsel that a blood sample from Putative Father had been located. Additionally, Grandmother had stipulated to Putative Father's paternity of Daughter in reliance on the test results, which indicated that Putative Father was the probable biological father of Daughter. Farrell related that when *The Honolulu Advertiser* article and Grandmother's investigation raised serious questions about whether a blood sample from Putative Father actually existed, Grandmother and Farrell attempted, unsuccessfully, to get the Corporation Counsel's office to explain the circumstances under which the blood sample was obtained and transmitted to the laboratory. Farrell stated that he had also personally "tried on several occasions" to call the laboratory. However, "[t]he phone rings and rings and rings and rings. There's no answer."

Farrell then told the court:

What we're asking the court to do is this, Your Honor. We need some answers. We're entitled to some answers. I think the estate is entitled to some answers. And it may well turn out that there is an explanation for all of this, that everything is in order, and that the judgment should not be set aside. But we deserve to find out what the truth is, and that's all I'm really here asking this court to give us. Let us find out what the truth is.

I think it's extremely important, Your Honor, not only for the inherent justice in this case but as a matter of public policy. Your Honor, there are literally thousands of paternity cases that are running through that courtroom right next door to us, and I can tell you as a member of the largest family law firm in this town and having done dozens if not hundreds of these cases that we in the bar rely upon integrity in the Corporation Counsel's office.

If they say they have a tissue sample, they got a tissue sample. If they say there's a test and this is the test result, that's the test result. And we entered into stipulations in good faith, and we expedite the business of the court. And we don't spend hours in trial fooling around on silly

12. The Honorable Dan T. Kochi presided over the hearing.

chain-of-custody issues when we don't have to because that office has integrity and because its word is trusted.

That's an important benefit both to this court and to that office. I can't understand why that office chooses to take the extreme position that they have, but I can tell you, Your Honor, that if the message that comes out of this case is that not only can you not trust what you get but if you even question it down the road, you're not going to get the answers, you're going to get stonewalled, then believe me the family law bar is not going to be entering into any stipulations anymore, and these cases are going to go a lot more slowly, and in a lot more cumbersome manner.

So for those reasons what we're asking the court to do is this: 1) Set this motion for trial. Whether or not the judgment needs to be set aside is not really something the court can decide today, but it should be set for trial at some point down the road. Probably three months.

Number 2. That gives me enough time to do the discovery that needs to be done. And, Number 3, since it's obvious the [Corporation] Counsel is not going to cooperate, I'm asking this court also to enter an order today directing the Corporation Counsel to provide information relating to the specifics of [Putative Father's] DNA testing, what they got, when they got it, who they got it from, what they did with it, so forth, either by way of their records or by testimony of anyone in their office who handled it.

Thereafter, CSEA's counsel argued that: (1) Grandmother's motion, which was brought pursuant to Rule 60(b)(2) and (3) of the FRCP, the Circuit Court Rules of Civil Procedure, the HRCP, and the HFCR, was untimely because it was not brought within one year of the entry of the Paternity Judgment; (2) the burden was on Grandmother to prove that fraud had been committed and that there was newly discovered admissible evidence that would have caused an entirely different result at trial; however, the evidence attached to Grandmother's motion was "hearsay, double hearsay, mostly innuendo, mostly unsubstantiated" and, therefore, inadmissible; (3) there is no right to discovery once a judgment has been entered; (4) the Paternity Judgment was "sound on its face" because "[i]t was agreed upon by the parties[,]" and "[t]he parties made a choice not to challenge the . . . chain of custody"[13]; and (5) "if the court wishes to see what we have in our file showing the chain of custody, we are not adverse to an in camera review[,]" but

there is an ongoing probate case as well as a criminal case that [Putative Father] is involved in. And it appears very frankly to our office that the reason that these documents were being sought was for those cases more than it was being sought for this paternity case.

And given the confidentiality law that governs paternity cases, our office is very hesitant to in any way breach those confidentiality rules, and more importantly we do not want to be having had been defending our paternity judgment in a probate case or even a criminal case. And those are our reasons for requesting of this court.

CSEA's counsel further recommended that if the first circuit family court, after reviewing CSEA's documents *in camera*, felt that more investigation was needed, "what we can do is a family study. . . . What can be done is tissue samples of genetic samples can be drawn from [Putative Father's] natural parents [ (Grandparents) ]. Those samples can be used in order to determine whether or not [Daughter] is in fact biologically related to [Grandparents] and therefore would (inaudible) that [Putative Father] is the father of [Daughter]."

The attorney for both Mother and Defendant Appellee Lloyd Y. Asato, the Special Administrator for Putative Father's estate and the Special Guardian of the property of Daughter, then explained to the court that a global settlement had been reached regarding wrongful death and other claims of Puta-

13. CSEA's counsel did acknowledge that "[h]ad the questions at that time been asked that are being asked now, certainly the parties would have been entitled to all of the answers that they are now seeking."

tive Father's estate resulting from the car accident that resulted in Putative Father's fatality. However, due to the questions surrounding Putative Father's blood sample and genetic test results, Grandparents were unwilling to agree to the settlement until the questions were resolved. The attorney suggested that a satisfactory resolution could be achieved if the first circuit family court reviewed the information in the possession of CSEA's counsel to determine whether a proper chain of custody existed as to the genetically tested blood sample allegedly taken from Putative Father. The first circuit family court did not, however, review the chain-of-custody documents.

Instead, towards the end of the hearing, the first circuit family court engaged in the following colloquy with Farrell:

> THE COURT: [Y]ou're saying that they're-at the time in 1997 that there was no sample whatsoever of [Putative Father]?
>
> MR. FARRELL: The evidence leads in that direction, Your Honor.
>
> THE COURT: Okay. So if that's the case and that's the point that you're asserting, then could not [sic] have a genetic test which would say that [Putative Father] was the father; right?
>
> MR. FARRELL: That's—
>
> THE COURT: Right?
>
> MR. FARRELL:—right.
>
> . . . .
>
> THE COURT: Okay. But *we do have at the time of the paternity hearing testimony from [Mother] that he was the father.* Okay. The only thing that the sample could say is whether yes or no that it's impossible if you had a sample.
>
> MR. FARRELL: That's right.
>
> THE COURT: Okay. If we go back to your position, you're saying that there was fraud because there was no sample; right?
>
> MR. FARRELL: That's how it looks.
>
> THE COURT: That's right. So it could not have been one hundred percent determined from the sample that he was the father. *But the court had other evidence that [Putative Father] was the father.* Okay.

> MR. FARRELL: Correct.
>
> THE COURT: *So if I take your point that there was no sample, the court made a correct ruling based upon the testimony from [Mother] that [Putative Father] was the father and there's no need for the court to set aside—*
>
> MR. FARRELL: But, Your Honor—
>
> THE COURT:—the judgment.
>
> MR. FARRELL:—her testimony was unchallenged because of the genetic test results. That's the only reason her testimony was unchallenged.
>
> THE COURT: Okay. *And the only issue before this court is whether or not the judgment of the court made on that day should stand. And there's no reason why that judgment should be set aside.* Okay.
>
> MR. FARRELL: These guys tricked us into agreeing to a judgment based on a paternity test that either didn't happen or was somebody else's sample or was who knows what. That isn't a grounds to set aside the judgment? Just 'cause some lady comes in and says I think he's the daddy?
>
> THE COURT: Your motion is denied.

(Emphases added.)

The order denying Grandmother's motion to set aside the Paternity Judgment was filed on November 22, 1999, and this timely appeal was filed on December 20, 1999.

## DISCUSSION

A. *Whether Grandmother Had Standing to Move to Set Aside the Paternity Judgment*

■ Initially, we disagree with the contention of CSEA's counsel, raised for the first time during oral arguments, that Grandmother lacks standing to prosecute this appeal because she appeared during the proceedings below only in her capacity as Special Administrator of Putative Father's estate and she has since been replaced as Special Administrator.

Pursuant to Hawaii Revised Statutes (HRS) § 584–15 (1993), "[t]he judgment or order of the court determining the exis-

tence or nonexistence of the parent and child relationship shall be determinative for all purposes." Therefore, any judgment of paternity in this case constitutes a final determination of Grandmother's relationship to Daughter and is binding precedent in any wrongful death action or probate proceeding that may involve Putative Father. Grandmother clearly had an interest in ensuring that the judgment was validly entered.

### B. *Whether Grandmother's Motion to Set Aside the Paternity Judgment Was Time–Barred*

Grandmother brought her motion to set aside the Paternity Judgment pursuant to clauses (2) and (3) of HFCR Rule 60(b). At the time Grandmother's motion was filed, HFCR Rule 60(b) provided as follows:

**RELIEF FROM DECREE OR ORDER.**

. . . .

(b) **Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud.** On motion and upon such terms as are just, the court may relieve a party or his [or her] legal representative from any or all of the provisions of a final decree, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(d)(2); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the decree is void; (5) the decree has been satisfied, released, or discharged, or a prior decree upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the decree should have prospective application; or (6) any other reason justifying relief from the operation of the decree. *The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the decree.* For reasons (1) and (3) the averments in the motion shall be made in compliance with Rule 9(b) of these rules. A motion under this subdivision (b) does not affect the finality of a decree or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a decree, order, or proceeding, or to set aside a decree for fraud upon the court. (Emphasis added.)

CSEA contends that Grandmother's motion, which was filed almost two years after the Paternity Judgment was filed, was untimely. In light of the express language of HFCR Rule 60(b), which requires motions filed under clauses (2) and (3) to be filed "not more than one year after the decree[,]" we agree with CSEA that Grandmother was time-barred from relying on those clauses for her motion.

Where a party cites the wrong rule in bringing a motion or fails to cite any rule at all, however, it is common for courts to treat the motion as being brought pursuant to the appropriate rule. In *Wilson v. Al McCord, Inc.*, 858 F.2d 1469 (10th Cir.1988), for example, the plaintiffs, after their motion for judgment notwithstanding the verdict had been denied, filed a "motion to reconsider." The Tenth Circuit Court of Appeals initially noted that

the [FRCP] do not provide a party subject to an adverse judgment the right to file the obligatory "motion to consider." Instead, the rules mandate that the aggrieved party, depending on the timing, file either a Rule 59[14] motion to alter or amend the judgment or a Rule 60 motion to vacate the judgment.

*Id.* at 1478 (citation omitted). Despite the plaintiffs' failure to mention Rule 60 in their motion, the court held:

Because more than ten days had elapsed before the filing of the motion to reconsider, *see* [FRCP Rule] 59(e), we construe it as a motion pursuant to [FRCP Rule] 60(b)(6): "[T]he court may relieve a party

---

**14.** Rule 59 of the Federal Rules of Civil Procedure provides, in relevant part:

(e) **Motion to Alter or Amend a Judgment.** Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.

... from a final judgment ... for the following reasons ... (6) any other reason justifying relief from the operation of the judgment."

*Id.*

Other federal courts have similarly construed post-judgment substantive motions for relief from judgment as falling under either Rule 59 or Rule 60(b), depending on when the motions were filed. *See* 12 J. Moore & M. Redish, *Moore's Federal Practice* § 59.11[4][b] (3d ed.2001), for general discussion of and listing of cases supporting this principle. In *United States v. Deutsch,* 981 F.2d 299 (7th Cir.1992), for example, the defendant filed a motion for reconsideration of an order more than two years after the order was entered. Although the defendant had not cited any rule as the basis for his motion, the Seventh Circuit Court of Appeals held that since the motion "challenges the merits of the district court's decision ... it must fall under either Rule 59(e) or Rule 60(b) of the [FRCP]." *Id.* at 300. The court then adopted the following test for considering motions challenging the merits of a judgment:

> In cases where it is unclear whether a motion challenging a judgment on the merits is made under Rule 59(e) or Rule 60(b) the Fifth Circuit follows a bright-line test: "Under which Rule the motion falls turns on the time at which the motion is served. If the motion is served within ten days of the rendition of judgment, the motion falls under Rule 59(e); if it is served after that time, it falls under Rule 60(b)." [*Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 173 (5th Cir.1990).] We adopted a version of the first part of this test in *Charles v. Daley,* 799 F.2d 343, 347 (7th Cir.1986), holding that "all substantive motions served within 10 days of the entry of judgment will be treated as based on Rule 59." Seeing no reason why the second part of the test is any less worthy than the first, we adopt it as well: substantive motions to alter or amend a judgment served more than ten days after the entry of judgment are to be evaluated under Rule 60(b)....

We find this method of characterizing motions under the two rules desirable because it provides a clear standard, easily applied by courts and understood by litigants....

One might object that our holding effectively reads the ten-day time limit out of Rule 59(e) because untimely 59(e) motions will now be analyzed under Rule 60(b) instead of being dismissed. Technically that may be correct; a motion will not be thrown out as untimely simply because it is captioned "Motion for Reconsideration" but was not served within ten days of the challenged judgment. In practice, however, our present decision will not save untimely Rule 59(e) motions from abrupt dismissal; substantive motions served from the eleventh day on must be shaped to the specific grounds for modification or reversal listed in Rule 60(b)—they cannot be general pleas for relief.... Consequently Rule 59(e) and Rule 60(b) will retain their distinct characters, and litigants should not expect to employ our rule as a Trojan horse for sneaking what are actually tardy Rule 59(e) motions into the courtroom under the guise of Rule 60(b).

*Id.* at 300–02 (footnotes omitted).

The Hawai'i Supreme Court, in line with the federal precedent, has instructed that it is "the substance of the pleading [that] controls, not the nomenclature given to the pleading." *Madden v. Madden,* 43 Haw. 148, 149–50 (1959) (holding that a timely "motion to set aside the final order and for other relief was a motion to alter or amend a judgment under rule 59(e), although not denominated as such" and tolled the time for filing an appeal until disposition of the motion). Similarly, this court has held that "to avoid confusion, and to prevent harsh results for unwary parties," any motion filed "within ten days of entry of judgment which seeks a substantive change" in a judgment, regardless of its label or reliance on HRCP Rule 60, "will be considered a Rule 59(e) motion which suspends the finality of the judgment and tolls the time to appeal." *Simpson v. Dep't of Land & Natural Resources,* 8 Haw.App. 16, 21, 791 P.2d 1267, 1272 (1990) (block quote formatting and citation omitted).

■ Applying the foregoing principle to the instant case, we likewise hold that although Grandmother's motion to set aside the Paternity Judgment pursuant to HFCR Rule 60(b)(2) and (3) was time-barred, the motion may be considered as having been properly brought pursuant to clause (6) of HFCR Rule 60(b). Indeed, in denying Grandmother's motion on substantive, rather than procedural, grounds, the first circuit family court appears to have implicitly considered the motion pursuant to clause (6).

## C. Whether a Paternity Action May be Commenced After the Death of a Putative Father

Before addressing the merits of the primary issue raised in this appeal, we believe it necessary to resolve an issue that has troubled courts in other jurisdictions: whether a paternity action may be commenced after the death of a putative father. Fueling the controversy is the "almost unanimous" case precedent, which Hawai'i case law appears to be in accord with, that

> absent a statute expressly providing for the survival of a cause of action, or of an action, to establish paternity and support of [a child with no presumed father],[15] neither the right of action nor an action already instituted survives the death of the putative father, so that no new filiation proceeding can be instituted against the decedent's estate, and an existing action which has not reached judgment abates and cannot be continued against decedent's personal representative..

Annotation, *Death of Putative Father as Precluding Action for Determination of Paternity or for Child Support*, 58 A.L.R.3d 188, §§ 2, 3, at 190–91 (1974 & Supp.2001) (inter-

nal footnotes omitted, footnote added); *Roe v. Doe*, 59 Haw. 259, 266, 581 P.2d 310, 315 (1978) (holding that "there is no common law right to a determination of paternity or to compel the putative father to support the child"); *In re Estate of Ching Lum*, 31 Haw. 533, 534 (1930) (stating that under intestate succession statutes, "a lawful widow" and "lawful children" may inherit from an intestate decedent, but not "[children with no presumed father]"); *Machado v. Kualau*, 20 Haw. 722, 723 (1911) (construing statutes as allowing a child with no presumed father to inherit "from his [or her] mother, but not from any one else").

The foregoing case precedent has been tempered somewhat by a United States Supreme Court decision striking, as violative of equal protection, a state statute that allowed children with no presumed father to inherit by intestate succession only from their mothers, but allowed children with presumed fathers to inherit from both their parents.[16] *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). However, the Supreme Court has upheld as constitutional a state statutory scheme that allows a child with no presumed father to inherit from the child's putative father only if a "an order of filiation declaring paternity" has been entered by a court of competent jurisdiction during the putative father's lifetime. *Lalli v. Lalli*, 439 U.S. 259, 262, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978).

The Supreme Court's rationalization in *Lalli* was that "the discrete procedural demands that [the statute] places on [children with no presumed father] bear an evident and substantial relation to the particular state interests this statute is designed to serve." *Id.* at 268. Among the state inter-

**15.** The Prefatory Note to the Uniform Parentage Act (UPA) (2000) states that UPA (1973) shunned the term "illegitimate" in favor of the term "child with no presumed father." For purposes of this opinion, we have substituted the preferred term in lieu of the term "illegitimate child" where the context of a quotation allows for such substitution.

**16.** By Act 288, 1996 Haw. Sess. L. 824, which took effect on January 1, 1997, the legislature amended the Uniform Probate Code, HRS chapter 560, by adding four new articles. One of the

statutory provisions added to the Uniform Probate Code by Act 288 was HRS § 560:2–114 (Supp.2001), which now clearly provides, in subsection (a), as follows:

> Except as provided in subsections (b) and (c), for purposes of intestate succession by, through, or from a person, an individual is the child of the child's natural parents, regardless of their marital status. *The parent and child relationship may be established under chapter 584.*

(Emphasis added.)

ests mentioned by the Supreme Court were the following: "to ensure the accurate resolution of claims of paternity and to minimize the potential for disruption of estate administration[,]" *id.* at 271, 99 S.Ct. 518; "to mitigate serious difficulties in the administration of the estates of both testate [17] and intestate decedents[,]" *id.* at 269–70, 99 S.Ct. 518; "to provide for the just and orderly disposition of property at death[,]" *id.* at 268, 99 S.Ct. 518; to "protect 'innocent adults and those rightfully interested in their estates from fraudulent claims of heirship and harassing litigation instituted by those seeking to establish themselves as [children-with-no-presumed-father] heirs[,]'" *id.* at 271, 99 S.Ct. 518; and to avoid the difficulties of proof that an estate would face if it had to defend a paternity action in the absence of the putative father. *Id.*

Since, under *Lalli*, reasonable statutory obstacles may be imposed by states that effectively bar a child with no presumed father from maintaining a paternity action after the death of the child's putative father, we must examine whether under Hawai'i law, any statutory strictures exist that would preclude a child with no presumed father from instituting a paternity action against a putative father after the latter's death.

Initially, we note that the Hawai'i Uniform Parentage Act (HUPA), HRS chapter 584, which governs paternity actions in Hawai'i and is based on the 1973 version of the Uniform Parentage Act (1973 UPA),[18] contains no provision that expressly authorizes paternity actions to be brought against a deceased putative father. Furthermore, two statutory sections of chapter 584 relevant to the posthumous action issue appear to be inconsistent.

On the one hand, HRS § 584-6 (1993), provides, in pertinent part:

**Determination of father and child relationship; who may bring action; when action may be brought; process, warrant, bond, etc.** (a) A child, or guardian ad litem of the child, the child's natural mother, whether married or unmarried at the time the child was conceived, or her personal representative or parent if the mother has died; or a man alleged or alleging himself to be the natural father, or his personal representative or parent if the father has died; or a presumed father as defined in section 584-4, or his personal representative or parent if the presumed father has died; or the child support enforcement agency, may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship....

(b) *When an action is brought under this section, process shall issue in the form of a summons and an order directed to the alleged or presumed father, the mother or both, requiring each to appear and to show cause why the action should not be brought.*

*If, at any stage of the proceedings, there appears probable cause to believe that the alleged or presumed father, the mother, or both, will evade the service of process, or will fail to appear in response thereto, or will flee the jurisdiction of the court, the court may issue a warrant directed to the sheriff, deputy sheriff, or any police officer within the circuit, requiring the alleged or presumed father, the mother, ór both, to be arrested and brought for pre-trial proceedings before the family court. Upon such pre-trial proceedings, the court may require the alleged or presumed father, the mother, or both, to enter into bond with good sureties to the State in a sum to be fixed by the court for each person's appearance and the trial of the proceeding in the family court. If the alleged or pre-*

---

**17.** The United States Supreme Court noted that a child with no presumed father must be served with process in the estate proceedings of the child's putative father who dies testate. If the existence of the child is not known to the putative father's family or personal representative, finality of the estate proceedings could never be ensured. *Lalli v. Lalli*, 439 U.S. 259, 270, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978).

**18.** In 2000, the National Conference of Commissioners on Uniform State Laws withdrew the 1973 version of the UPA and promulgated the 2000 version of the UPA as the "single product of the Conference dealing with the subject." UPA (2000), Prefatory Note, 9B U.L.A. 295, 297 (2001). The Hawai'i legislature has not yet adopted the 2000 version of the UPA.

*sumed father*, the mother, or both, *fails to give the bond required, the court may forthwith commit that person to the custody of the chief of police of the county, there to remain until that person enters into the required bond or otherwise is discharged by due process of law. If the alleged or presumed father*, the mother, or both, *fails to appear in any proceeding under this chapter, any bond for that person's appearance shall be forfeited; but the trial of, or other proceedings in, the action shall, nevertheless, proceed as though that person were present; and upon the findings of the court it shall make such orders as it deems proper as though that person were in court.*

(Emphases added.)

Literally, the foregoing statutory provision seems to contemplate that a paternity action be brought only against a living putative father since the statute: (1) requires that a summons and order be personally served on the putative father, (2) provides that a putative father may be arrested and required to post a bond, (3) allows for the jailing of a putative father for failing to post a bond, and (4) provides for forfeiture of a posted bond if a putative father fails to appear at any proceeding.

Construing a similar statutory scheme, the Maine Supreme Court observed that it would be incongruous if a paternity action survived a putative father's death because the administrator of the putative father's estate could then be "arrested, required to give a bond, be put on trial, and perhaps imprisoned, for an act of bastardy committed by the party officially represented by him." *McKenzie v. Lombard*, 85 Me. 224, 27 A. 110 (1892). Similarly, the Connecticut Supreme Court held that a statutory mandate that a putative father be summoned *"to appear"* to answer a paternity petition indicates a legislative intent that he be alive. *Hayes v. Smith*, 194 Conn. 52, 480 A.2d 425, 430 (1984) (emphasis in original).

On the other hand, HRS § 584–8(d) (Supp. 2001) seems to allow paternity actions to be initiated posthumously:

**Jurisdiction; venue.**

. . . .

(d) The [paternity] action may be brought in the county in which the child, the mother, or the alleged father resides or is found or in which the child was born or, *if the father is deceased, in which proceedings for probate of his estate have been or could be commenced.*

(Emphasis added.)

HRS § 584–8 is a jurisdiction and venue statute and does not literally allow a paternity action to be brought against a deceased father. However, by providing that if a putative father is deceased, the paternity action may be commenced in the county in which the putative father's estate has been or could be commenced, the statute implies that a paternity action may be brought against a putative father's estate, and several other states which have adopted the 1973 UPA have construed their statutory counterpart to HRS § 584–8 as authorizing such posthumous actions. *See, e.g., Rabb v. Estate of McDermott*, 60 Wash.App. 334, 803 P.2d 819, 822 (1991) (holding that from the language of the Washington statute analogous to HRS § 584–8, "it is clear ... that the Legislature intended that a paternity action survive the alleged father's death"); *Reddick v. Murray*, 266 Ill.App.3d 333, 203 Ill.Dec. 739, 640 N.E.2d 659 (1994) (construing Section 45/9(b) of the Illinois Parentage Act of 1984, which is almost identical to HRS § 584–8(d), as allowing survival of a paternity action after the death of a putative father and authorizing paternity proceedings after death as a separate and distinct remedy from heirship actions). *But see Hullum v. Sullivan*, 762 F.Supp. 1324 (N.D.Ill.1991) (holding that since Wisconsin's survival of actions statute did not provide for survival of paternity actions, the Wisconsin statutory section analogous to HRS § 584–8(d) could not be construed to permit the bringing of a paternity action after the putative father is dead).

■ For the reasons that follow, we agree with those states that have construed their HRS § 584–8(d) counterparts as allowing a paternity action to be brought after the death of the putative father.

**1.**

First, the remedial and beneficent purposes that prompted the legislature to enact HUPA supports the allowance of posthumous paternity actions.

HRS § 584-8(d) is nearly identical to Section 8(c) of the 1973 UPA.[19] 9B U.L.A. 429 (2001). Although the comments to the 1973 UPA are silent as to the intent of the National Conference of Commissioners on Uniform State Laws in adopting Section 8(c) of the UPA, the Prefatory Note to the 1973 UPA explains the genesis of the 1973 UPA, in part, as follows:

> When work on this Act began, the notion of substantive legal equality of children regardless of the marital status of their parents seemed revolutionary if one considered existing state law on this subject. See Krause, Equal Protection for the Illegitimate, 65 Mich.L.Rev. 477 (1967). Even though the Conference had put itself on record in favor of equal rights of support and inheritance in the Paternity Act and the Probate Code, the law of many states continued to differentiate very significantly in the legal treatment of [children with and with no presumed fathers].
>
> This Act is promulgated at a time when the states need new legislation on this subject because the bulk of current law on the subject of children born out of wedlock is either unconstitutional or subject to grave constitutional doubt.
>
> Since 1968, a series of decisions rendered by the United States Supreme Court under the Equal Protection Clause of the 14th Amendment of the U.S. Constitution has mandated equal legal treatment of [children with and with no presumed fathers] in a broad range of substantive areas, one exception being the right of intestate succession. Quotations from two recent decisions illustrate the Supreme Court's views on this subject:
>
> "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the [child with no presumed father] is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the [child with no presumed father] is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise" Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 1406-07, 31 L.Ed.2d 768 (1972).

"We have held that under the Equal Protection Clause of the Fourteenth Amendment a State may not create a right of action in favor of children for the wrongful death of a parent and exclude [children with no presumed father] from the benefit of such a right. Similarly, we have held that [children with no presumed father] may not be excluded from sharing equally with other children in the recovery of work[ers'] compensation benefits for the death of their parent. Under these decisions, a State may not invidiously discriminate against [children with no presumed father] by denying them substantial benefits accorded children generally. We therefore hold that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because [his or] her natural father has not married [his or] her mother. For a State to do so is "illogical and unjust." We recognize the lurking problems with respect to proof of paternity. Those problems are not to be

---

**19.** Section 8(c) of the 1973 UPA provides:

The action may be brought in the county in which the child or the alleged father resides or is found or, if the father is deceased, in which proceedings for probate of his estate have been or could be commenced.

lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination." (Citations omitted). *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 874–75, 35 L.Ed.2d 56 (1973).

Accordingly, in providing substantive legal equality for all children regardless of the marital status of their parents, the present Act merely fulfills the mandate of the Constitution. With the exception of the child's right to inherit from his [or her] intestate father, which a growing number of states has provided without constitutional compulsion, the equal treatment provided by the Act is not the Conference's "wishful thinking." It is the law of the land.

*Id.* at 378–79.

In *Doe v. Roe*, 67 Haw. 63, 677 P.2d 468 (1984), the Hawaiʻi Supreme Court discussed the remedial purposes of HUPA in deciding that retroactive effect must be given to a legislative amendment enacted while the appeal was pending that extended the statute of limitations for paternity actions from three years after a child's birth to three years after the child reaches the age of majority. The supreme court explained that HRS chapter 584 "is remedial in nature and must be construed liberally in order to accomplish the purpose for which it was enacted. That purpose is to provide substantive legal equality for all children regardless of the marital status of their parents." *Id.* at 65, 677 P.2d at 470.

### 2.

Second, we note that in *Doe v. Roe*, the supreme court acknowledged the legislature's cognizance of the reliability of modern genetic tests to prove or disprove paternity:

The legislature, in the committee reports attached to Act 288 [§ 2, 1983 Haw. Sess. L. 615], cited the problems of proof surrounding paternity actions as justification for a short limitations period to protect alleged fathers from stale and fraudulent claims. *The legislature went on to recognize, however, that scientific advances in blood testing reduced the evidentiary problems of older claims.* Hse. Stand. Comm.

Rep. No. 429, Regular Session of 1983; Sen. Stand. Comm. Rep. No. 790, Regular Session of 1983. *These scientifically conducted blood tests were deemed highly probative in proving paternity.* Their effectiveness has already been recognized by the United States Supreme Court. *Little v. Streater*, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981). *It is apparent that the legislature determined that the problems of proof which justify a short limitations period no longer existed.* Further, the legislature recognized two purposes in extending the limitations period. One is the public's interest in relieving the welfare burden when the natural parent can and should be responsible for the child's support. Hse. Stand. Comm. Rep. No. 429, *supra.* Second, it would relieve the child of being wholly dependent upon its mother for establishing paternity. Sen. Stand. Comm. Rep. No. 790, *supra.*

*Id.* at 65–66, 677 P.2d at 470 (emphases added). In light of the reliability of modern scientific paternity tests, the concerns underlying the common law rule precluding posthumous paternity actions are largely obviated if body tissue or fluids from a deceased putative father is available for genetic testing.

D. *Whether the First Circuit Family Court Abused Its Discretion in Denying Grandmother's Motion to Set Aside the Paternity Judgment*

■ The Hawaiʻi Supreme Court has instructed that the denial of an HFCR Rule 60(b) motion to set aside a judgment must be reviewed on appeal under the abuse of discretion standard. *Hawaii Housing Authority v. Uyehara*, 77 Hawaiʻi 144, 147, 883 P.2d 65, 68 (1994). An abuse of discretion occurs when a trial court "bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Lepere v. United Public Workers 646*, 77 Hawaiʻi 471, 473, 887 P.2d 1029, 1031 (1995) (internal brackets and quotation marks omitted). Stated otherwise, a trial court abuses its discretion when it "has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substan-

tial detriment of a party litigant." *Canalez v. Bob's Appliance Center, Inc.,* 89 Hawai'i 292, 299, 972 P.2d 295, 302 (1999) (internal quotation marks and brackets omitted).

After considering Grandmother's motion to set aside the Paternity Judgment, the first circuit family court denied it on the sole basis that even if no blood sample from Putative Father existed and the genetic test results had to be disregarded, Mother's testimony that Putative Father was Daughter's biological father was, by itself, sufficient to establish Putative Father's paternity.

### 1.

The United States Supreme Court has acknowledged, however, that "peculiar problems of proof" are involved in actions to establish the paternity of a putative father who is not part of a formal family unit. *Lalli v. Lalli,* 439 U.S. at 268–69, 99 S.Ct. 518 (noting that the putative father is often unconscious of the birth of a child or, if conscious, is "often totally unconcerned because of the absence of any ties to the mother"; additionally, the "mother may not know *who* is responsible for her pregnancy") (emphasis in original).

The problems of proof are even greater in a paternity action brought against a dead man, for as the Wisconsin Supreme Court observed in *In re Estate of Blumreich,* 84 Wis.2d 545, 267 N.W.2d 870, 877–78 (1978):

[T]he accusation of paternity is easy to make but difficult to defend against. To permit paternity to be established after the death of the putative father, on the basis of his alleged informal, verbal statements, would be to place his estate at an unreasonable disadvantage in defending against spurious claims. The decedent would be unavailable to assert defenses or to assist in the cross-examination of his accusers. Information about his blood, which might conclusively eliminate him as the father, might not be available to his estate. His death thus undermines the reliability of the fact-finding process....

....

Proof of paternity by posthumous second-hand testimony would be imprecise, unreliable and susceptible to fraudulent claims, and would inject intolerable uncertainty into estate proceedings and wrongful death actions.

(Citations omitted.)

In light of the proof problems and potential fraud concerns that are inherent in any action brought to establish the paternity of a dead man, we conclude, as a matter of law, that Mother's conclusory statement that Putative Father was Daughter's biological father was, by itself, insufficient to satisfy CSEA's burden of proving Putative Father's paternity.[20]

20. In *Doe II v. Roe II,* 3 Haw.App. 233, 234–35, 647 P.2d 305, 307 (1982), this court held that the burden of proof in paternity suits brought under HRS chapter 584 is the preponderance of the evidence standard. *Doe II* was a case in which the paternity action was brought against a putative father who was alive. We note that many other jurisdictions, either by statute or case law, require clear and convincing proof to establish the paternity of a putative father who is deceased. *See, e.g., Reid v. Flournoy,* 600 So.2d 1024 (Ala.Civ.App.1992) (construing Ala.Code 1975, § 43–8–48, which requires paternity proven after death of the father to be established by clear and convincing proof); *Lucas v. Handcock,* 266 Ark. 142, 583 S.W.2d 491 (Ark.1979) (holding that the clear and convincing evidence standard of proof is applicable to determine paternity of a deceased man); Idaho Code § 15–2–109; *Matter of Estate of Lukas,* 155 Ill.App.3d 512, 108 Ill.Dec. 207, 508 N.E.2d 368, 374 (1987) (holding that the "clear and convincing" standard of proof applies "in actions when a party seeks an adjudication of paternity after the death of the

alleged father"); Kentucky Rev. Stat. § 391.105; Louisiana CC Art. 209(B); *Estate of Elias,* 451 A.2d 637, 639, n. 2 (Me.1982) (holding that by statute, "[a] child born out of wedlock is a child of the father if 'paternity is established after the father's death by clear and convincing proof'" (internal brackets omitted)); Mississippi Code § 91–1–15; Missouri Rev. Stat. § 474.060; Nebraska Rev. Stat. § 30–2309; New Hampshire Rev. Stat. § 561:4; New York Est. Pow. & Trst. § 4–1.2; 20 Pennsylvania Stat. § 2107; Rhode Island Gen. Laws § 15–8–8; South Carolina Code § 62–2–109; South Dakota Codified Laws § 29A–2–114; Tennessee Code § 31–2–105; *In re A S L,* 923 S.W.2d 814, 818 (Tex.Ct.App.1996) (holding that clear and convincing standard applies to action of an illegitimate child to establish the alleged father's paternity after death of the alleged father).

The Minnesota Supreme Court, in adopting the clear and convincing standard by case law, explained:

This requirement provides a significant measure of protection to the putative father's es-

## 2.

At the time of the proceedings below, HRS § 584–12 (Supp.1997) provided as follows:

**Evidence relating to paternity.** Evidence relating to paternity may include:

(1) Evidence of sexual intercourse between the mother and the alleged father at any possible time of conception;

(2) An expert's opinion concerning the statistical probability of the alleged father's paternity based upon the duration of the mother's pregnancy;

(3) Genetic test results, including blood test results, weighed in accordance with evidence, if available, of the statistical probability of the alleged father's paternity;

(4) Medical or anthropological evidence relating to the alleged father's paternity of the child based on tests performed by experts. If a man has been identified as a possible father of the child, the court may, and upon request of a party shall, require the child, the mother, and the man to submit to appropriate tests;

(5) A voluntary, written acknowledgment of paternity that shall create a rebuttable presumption of paternity; and

(6) All other evidence relevant to the issue of paternity of the child.

In this case, except for the genetic test results of Putative Father's probable paternity of Daughter, which the first circuit family court disregarded, none of the evidence described in HRS § 584–12 was presented at the hearing on the initial paternity action.

## 3.

We acknowledge that courts in other jurisdictions have often accepted, as a general proposition, that a finding of paternity may be based on a mother's uncorroborated, but

---

believed, testimony. *See, e.g., People ex rel. Adams v. Kite,* 48 Ill.App.3d 828, 6 Ill.Dec. 653, 363 N.E.2d 182, 185 (1977) (stating that "[i]n the ordinary case, [the mother's] own testimony, if believed, can sufficiently meet 'the burden of' the mother 'to establish that the defendant, more probably than not, is the father of her child'"); *Bragg v. District of Columbia,* 98 A.2d 784 (D.C.1953) (holding it to be "well settled that where no such requirement is laid down by the governing statute the defendant may be found to be the father on the uncorroborated testimony of the mother, where such testimony is credible, sufficiently clear, and convincing").

In the cases we have reviewed that allowed a mother's uncorroborated testimony to form the basis for a finding of paternity, however, the paternity action was against a putative father who was alive and able to defend himself. Additionally, the mother's uncorroborated testimony which was relied on by the trial judge to establish paternity consisted of far more than just a conclusory statement that the putative father was the biological father of the mother's child. In *Bragg,* for example, the "complainant [mother] testified that she had sexual relations with appellant several times during the critical period; that she had relations with no one else during this time; that appellant admitted in his testimony having had intercourse with the complainant on almost every occasion that he saw her over a period of several months; and that he admitted seeing her during the critical period (although he denied any sexual relations during this period)." *Id.* at 785. In *Roe v. Doe,* 154 Ind.App. 203, 289 N.E.2d 528 (1972), (the mother testified that she had sexual relations with the appellant in June of 1961; approximately nine months later, on February 26, 1962, the child was born; she did not have sexual relations with anyone

---

tate, but does not take from the child all opportunity to prove paternity. "Clear and convincing proof" means exactly what is suggested by the ordinary meanings of the terms making up the phrase. Satisfaction of this standard requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt. Clear and convincing proof will be shown where the truth of the facts asserted is "highly probable."

---

*Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn. 1978).

We do not decide in this opinion whether the clear and convincing standard should be applied to a paternity action against the estate of a putative father who is deceased. However, even under the preponderance of evidence standard, we conclude that Mother's conclusory testimony in this case was insufficient to satisfy the standard.

prior to June 1961; and the appellant admitted being the father of the child and had paid support money for the child from the child's birth until the paternity action was commenced). *See also People ex rel. Adams v. Kite,* 6 Ill.Dec. 653, 363 N.E.2d at 185 (upholding a directed verdict in the defendant's favor on grounds that although, ordinarily, a mother's "own testimony, if believed, can sufficiently meet" the preponderance of the evidence standard, "this is not the ordinary case" since the mother claimed that the defendant had impregnated her in a scientifically questionable manner); *State ex rel. Hausner v. Blackman,* 233 Kan. 223, 662 P.2d 1183, 1190–91 (1983) (stating that "[i]t is true it has been said paternity may be adjudged solely upon the mother's testimony of an act of sexual intercourse with the putative father at or near the time the child was conceived and that he is the father, but the precedential case authority for that statement does not support a paternity judgment on evidence as uncertain and flimsy as the evidence in this case") (parenthetical citation omitted); *State Dep't of Social Servs. v. Pierre,* 634 So.2d 1224 (La.Ct.App.1994) (holding that in the absence of evidence of the child's birthday or testimony that the mother and the putative father had engaged in sexual intercourse, the mother's testimony that the putative father was "the only guy I was involved with at the time" and that the putative father had bought things for and visited the child was insufficient to establish paternity).

## CONCLUSION AND INSTRUCTIONS ON REMAND

Based on the foregoing discussion, we conclude that the first circuit family court erred in denying Grandmother's motion to set aside the Paternity Judgment on the sole basis that Mother's testimony that Putative Father was Daughter's biological father was, by itself, legally sufficient to establish Putative Father's paternity. Since Putative Father was deceased and unable to defend himself, Mother's uncorroborated and conclusory statement was, by itself, insufficient as a matter of law, to establish Putative Father's paternity. Accordingly, we vacate the November 22, 1999 order of the first circuit family court that denied Grandmother's

HFCR Rule 60(b) motion to set aside the Paternity Judgment on that basis and remand for further proceedings on the motion.

We express no opinion as to whether Grandmother's HFCR Rule 60(b) motion to set aside the Paternity Judgment may properly be denied on remand on any other basis than that relied upon by the first circuit family court in issuing the order that is the subject of this appeal.