*In re* ESTATE OF RAYMOND LUKAS, SR., Deceased (Raymond Edward Lukas, a Minor, by and through his Mother and Next Friend, Colleen McHugh, Petitioner-Appellant, v. American National Bank and Trust Company of Chicago, as Adm'r of the Estate of Raymond Lukas, Sr., Deceased, Respondent-Appellee).

First District (1st Division) No. 85—3051

Opinion filed May 4, 1987.

Philip E. Howard, Ltd., of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Doyle & Ryan, Ltd., of Chicago (John A. Doyle, of counsel), for appellee American National Bank & Trust Company of Chicago.

Querrey, Harrow, Gulanick & Kennedy, Ltd., of Chicago (Henry C. Szesny and Michael Resis, of counsel), for appellee 3/M National Advertising Company.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

Raymond Edward Lukas, a minor, by and through his mother and next friend, Colleen McHugh, filed a petition in the circuit court of Cook County seeking to amend the order of heirship for the estate of Raymond Lukas, Sr., deceased. Following a hearing, the trial court denied the petition finding that the petitioner had failed to prove by clear and convincing evidence that Raymond Edward Lukas was the son of the deceased. Petitioner appealed.

We affirm.

The issue presented by this appeal is whether the trial court's finding that the petitioner failed to prove by clear and convincing evidence that Raymond Edward Lukas is the son of the deceased, Raymond Lukas, Sr., is against the manifest weight of the evidence.

The facts pertinent to this appeal are as follows. On February 11, 1983, the decedent, Raymond Lukas, Sr., died intestate as a result of injuries suffered at work. At the time of his death, the decedent was divorced from Mary Lukas, was the father of Raymond John Lukas, Jr., and had not remarried. On November 18, 1983, the probate court entered an order of heirship declaring Raymond John Lukas, Jr., to be the decedent's sole heir. On December 22, 1983, the court appointed American National Bank & Trust Company of Chicago administrator of the decedent's estate. On the same day, the instant petition seeking to amend the order of heirship for the decedent's estate was filed.

The petitioner, Colleen McHugh, alleged that at the time the probate court declared Raymond John Lukas, Jr., to be the decedent's sole heir, another heir existed, *viz*, Raymond Edward Lukas. It was further alleged that Colleen McHugh had lived with the decedent from December 22, 1982, until his death, that Raymond Edward Lukas was conceived by the decedent and Colleen McHugh on or about January 24, 1983, and that Raymond Edward Lukas was born on October 24, 1983. Accordingly, the petitioner requested that the probate court amend the order of heirship to include Raymond Edward Lukas.

Apparently, the only asset in the decedent's estate was a negligence claim under the Structural Work Act (Ill. Rev. Stat. 1983, ch. 48, pars. 60 through 69) which is currently being litigated in the circuit court of Cook County. The probate court granted the parties in

that litigation permission to intervene in the proceeding here.

At the hearing on the petition to amend the order of heirship, Colleen McHugh testified that the decedent was her only sexual partner from November of 1982 until March of 1983. McHugh stated that she began dating the decedent in September of 1982 and moved in with him a few days after Christmas. However, McHugh did not inform her employer of her new address until January 13, 1983, and, even though her bank was across the street from her place of employment, she also did not order new checks until February 11, 1983, the date of the decedent's death.

Before moving in with the decedent, McHugh testified that she and the decedent would engage in sexual relations two to four times per week. After she moved in, she said the frequency increased to two to five times daily. Further according to McHugh, that while the decedent would normally use a condom, he did not always do so. She stated that her last menstrual cycle prior to the petitioner's birth began on January 7, 1983, and she calculated that her next period should have begun on February 4. McHugh said she believed that she informed the decedent on February 6, approximately five days before his death, that her period was late. McHugh stated that her gynecologist confirmed her pregnancy in March of 1983.

On the day of the decedent's death, after she was notified of his death, McHugh testified she removed three to five pieces of her clothing from the decedent's apartment in the presence of his ex-wife, Mary Lukas. McHugh claimed she did not remove all of her clothing at that time but waited two weeks before removing the rest of her belongings. McHugh also claimed that she used one entire closet and two dresser drawers to store her clothes at the decedent's apartment while she lived with him. Immediately after the decedent's death, McHugh stated that she stayed with the decedent's sister, Jeri Lynn Valle, for two nights because she needed transportation to the decedent's funeral. She admitted that she had asked Valle for some sanitary napkins during her stay. She explained this, however, by stating that she merely wanted them in case she needed them, but she said she never did need them.

McHugh also admitted in her testimony that she became sexually involved with the decedent's brother, Edward Lukas, in March of 1984. Edward Lukas, who testified on behalf of the petitioner, corroborated her testimony concerning their relationship. He stated that he lived with McHugh from May of 1984 until October of 1984 and said that he had not been involved with McHugh since that time. Lukas acknowledged that he is Raymond Edward Lukas' godfather and that

he began to give McHugh money approximately one month before Raymond Edward Lukas was born and continued to give her $100 per week while they lived together.

Lukas also claimed in his testimony that he talked to the decedent by telephone two days before his death, that the decedent had told him that McHugh was pregnant and that he, the decedent, was going to do "the right thing." However, Lukas said that the decedent never explained what he meant by "the right thing." Additionally, while Edward Lukas asserted that he told his friends at work about the decedent's statement to him, he admitted that he never told his sister or parents and that he never even told McHugh about what the decedent had told him until August or September of 1984.

The decedent's mother, Geraldine Peer, who testified on behalf of the estate, corroborated Edward Lukas' statement that he did not tell her about the decedent's alleged statement until after the child was born. Peer also stated that the petitioner was flirting with and falling all over her son, Edward Lukas, on the day of the decedent's funeral.

The decedent's sister, Jeri Lynn Valle, also testified for the estate and stated that the decedent told her that both he and McHugh were dating other people. She also said that McHugh stayed with her for two nights prior to the decedent's funeral and that she had placed a new box of sanitary napkins in McHugh's room because McHugh told her that she was having her menstrual flow. The day after decedent's funeral, Valle stated that she observed that the box was half empty. She also said that while she had assumed that the decedent and McHugh were having sex, she did not know that for sure. Furthermore, Valle admitted that she was aware that any worker's compensation or social security payments to her brother's son, Raymond John Lukas, Jr., would be reduced if Raymond Edward Lukas was also found to be the decedent's son.

Additionally, the decedent's ex-wife, Mary Lukas, testified for the estate and said that she and Joseph DeOrnellas went to the decedent's apartment after his death, and, while they were at the apartment, McHugh had knocked at the door and they had let her in. According to Mary Lukas, McHugh left the apartment that evening taking only a nightgown and a robe, and, except for McHugh's television set, Mary Lukas saw no other items belonging to McHugh. Mary Lukas also stated that she saw the petitioner and Edward Lukas "making out" in an automobile approximately one month after the decedent's funeral. Joseph DeOrnellas, who also testified, corroborated Mary's testimony. At the time of the hearing, DeOrnellas and Mary Lukas were engaged to be married and had been living together since

November of 1982.

Finally, John Dizzano, a man Colleen McHugh had denied knowing, testified at the hearing and said that he had met McHugh in December of 1982, and, contrary to McHugh's claim that the decedent was her only sexual partner during the critical period, Dizzano stated that he had sexual intercourse with her approximately six or seven times during the first three months of 1983. Dizzano testified concerning a scar McHugh had as a result of surgery, but Dizzano erroneously described the scar as being on McHugh's left side and chest when, in fact, McHugh's scar was on her left side and back. Dizzano also admitted that he was good friends with Mary Lukas and Joseph DeOrnellas. Dizzano testified that he stopped seeing McHugh in late February or early March of 1983 when they had a fight at Stump's Pub because Dizzano would no longer lend money to McHugh. Joseph Ciancanelli testified that he saw Dizzano and McHugh fighting at Stump's Pub, but Ciancanelli stated he believed the fight occurred in February or March of 1982 and not 1983.

Furthermore, both the petitioner and the estate presented expert testimony regarding the results of two series of blood tests.[1] The petitioner presented the evidentiary deposition of Mary-Claire King, who held a Ph.D. degree in genetics and was an associate professor of epidemiology at the University of California, Berkeley. King explained in her testimony that due to recent developments blood test results cannot only exclude a man as the father but that the results can now be used to determine the probability that the man is, in fact, the father. King also stated that she helped to develop a "grand paternity testing" program which uses the same techniques used in regular paternity testing. According to King, grand paternity testing can link, genetically, an individual to his or her grandparents when one or both of the individual's alleged parents are deceased, as here. King testified that she analyzed the blood test data supplied by the American Red Cross and specifically used the Human Leukocytes Antigen (HLA) data in her analysis. King further testified that the particular HLA gene that Raymond Edward Lukas would have received from his bio-

---

[1]Blood samples from the following 10 people were tested: the petitioner, Colleen McHugh; Colleen McHugh's biological parents, Patricia McHugh and Patrick McHugh; the child whose paternity is at issue, Raymond Edward Lukas; decedent's biological parents, Geraldine Peer and Leonard Lukas; decedent's brother, Edward Lukas; decedent's ex-wife, Mary Lukas; decedent's legitimate son, Raymond John Lukas, Jr.; and John Dizzano. It was impossible to obtain a sample from the decedent. The American Red Cross performed one set of blood tests. A hospital in Chicago performed a second set of blood tests.

logical father was also carried by the decedent's mother, Geraldine Peer, his alleged paternal grandmother. According to King, only 28 in 10,000 Caucasians in the United States carry that particular HLA gene. King then compared the likelihood that petitioner obtained this particular gene from the decedent with the likelihood that the petitioner obtained this gene by chance. In King's opinion, there was a 98.9% chance that the decedent was the father of Raymond Edward Lukas.

King also analyzed the American Red Cross data with respect to other genetic markers. Considering each marker independently, she said that none excluded the decedent as the petitioner's father. However, King admitted that these other tests contain very little information for determining the probability of paternity. King also testified that both Edward Lukas and John Dizzano were excluded to a genetic certainty as Raymond Edward Lukas' father. King stated that she analyzed the HLA data from a second set of blood tests performed by another laboratory and that her analysis of the second set of test data was consistent with her analysis of the American Red Cross data, i.e., there was a probability of paternity, in her opinion, of 98.9%. King testified that she believed that the decedent was Raymond Edward Lukas' father.

Mark Gebel also testified for the petitioner at the hearing. Gebel, who also held a Ph.D. degree, stated that he was the director of the histocompatibility and hematology department at Rush-Presbyterian-St. Luke's Hospital in Chicago, Illinois. Gebel stated that a "paternity index" is used to assist in calculating the probability of paternity and defined "paternity index" as the probability that the individual in question is the father of the particular child as compared to the probability that it is the child of a random individual. In his calculations, Gebel assumed an equal probability of 0.5, or a 50% chance, that the decedent was the father of Raymond Edward Lukas as compared to a random individual. Gebel believed that King assumed a figure of 0.9, or a 90% probability figure. Gebel admitted that considerably different probability of paternity figures result when different paternity indices are used. He stated that, based solely on HLA data, it was his opinion that there was a 97.36% probability that the decedent was the father of Raymond Edward Lukas.

Gebel also testified concerning another genetic marker he had examined which is called "glycocholates" (GLO). Gebel stated that HLA and GLO markers pass as a unit as if cemented together. However, here, there was, he said, a discrepancy in the GLO values asso-

ciated with the HLA marker shared by the decedent's mother, Geraldine Peer, and the decedent's putative son, Raymond Edward Lukas. Gebel claimed, however, that the GLO discrepancy did not affect his 97.36% probability of paternity figure, but he also admitted that he was not qualified to render an expert opinion on what effect the GLO discrepancy would have on the probability of paternity.

Thomas Sinclair, who held a Ph.D. in microbiology, testified for the estate and stated he was the director of the oncological research department at the Chicago Medical School in Chicago, Illinois, and also the director of the recently licensed Parental Testing Laboratory in Chicago, Illinois. Sinclair agreed that the GLO and HLA markers pass as a unit, but he stated that in his opinion, one obtains an artificially high figure when the HLA is the only or single genetic marker used to determine the probability of paternity. He explained one reason for the high figures here was the failure to check to see if the GLO figures associated with the shared HLA marker were compatible. Sinclair testified that there was a one-in-two chance that the decedent had the same HLA marker shared by Geraldine Peer and Raymond Edward Lukas. However, because of the discrepancy between Geraldine Peer's and Raymond Edward Lukas' GLO values associated with the shared HLA marker, Sinclair stated that a crossover, i.e., a recombination, had to have occurred if the decedent was Raymond Edward Lukas' father. Sinclair said that crossovers are very rare events and occur only 0.8% of the time. After considering this probability of a crossover, Sinclair concluded that there was a 99.2% probability that the decedent was not Raymond Edward Lukas' father.

Thereafter, the petitioner called Fritz Bach, an M.D., and a professor of immunobiology at the University of Minnesota, Minneapolis, to rebut the testimony of Thomas Sinclair regarding his interpretation of the HLA and GLO data. Bach asserted that Sinclair's conclusions were inconsistent with the facts because it could not be established conclusively that a discrepancy did, in fact, exist in the GLO values associated with the HLA marker shared by Geraldine Peer and Raymond Edward Lukas. Bach did agree, however, that there was a 93% to 98% chance that a discrepancy did exist and that a crossover was required if a discrepancy existed.

Bach disagreed with Sinclair's 0.8% crossover probability and set the average crossover probability higher, at about 5.5%. Under the facts of this case, Bach said there was, in fact, an 11% chance for a crossover and that it was very likely, in his opinion, that a crossover occurred. Bach did admit, however, that the GLO findings must be

considered in determining the probability of paternity and that the GLO findings alone reflect an 89% probability against paternity here. Bach, nevertheless, claimed that the probability of paternity could not be excluded solely on the basis of the GLO results. He stated, in fact, that he actually concurred with King's probability of paternity figure of 98.9%.

Subsequently, after hearing the arguments of counsel, the trial court ruled that the petitioner failed to prove by clear and convincing evidence that the decedent, Raymond Lukas, Sr., was the father of Raymond Edward Lukas and entered an order dismissing the petition.

Initially, we address the petitioner's argument that the trial judge held her to a stricter standard of proof than required under section 2—2(h) of the Probate Act of 1975 (Ill. Rev. Stat. 1983, ch. 110½, par. 2—2(h)). She claims that the trial judge required her to prove beyond a reasonable doubt that Raymond Edward Lukas was the son of the decedent. Petitioner asserts that this is the standard the court required since, in his order denying her petition, the judge had indicated that he had doubt tantamount to a "reasonable doubt" and, for that reason, was denying her petition. We find this argument to be without merit.

■ The petitioner's burden of proof here was to prove paternity by "clear and convincing evidence" because the proceeding to adjudicate paternity did not take place during decedent's lifetime. (See *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 398 N.E.2d 198; *Morelli v. Battelli* (1979), 68 Ill. App. 3d 410, 386 N.E.2d 328; Ill. Rev. Stat. 1983, ch. 110½, par. 2—2(h).) In *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 398 N.E.2d 198, this court explained the "clear and convincing" standard of proof which applies in actions when a party seeks an adjudication of paternity after the death of the alleged father stating:

"[P]roof by clear and convincing evidence has most often been defined as the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question [citations]." 79 Ill. App. 3d 8, 14, 398 N.E.2d 198, 203.

■ Our examination of the record reveals that the petitioner here was held to the proper standard of proof and that the trial judge's comment concerning his reasonable doubt merely reflected the manner in which we have described the "clear and convincing" standard. Additionally, the trial judge, in his oral comments at the time he denied the petitioner's motion for a new trial, clearly stated

that the standard of proof he applied was proof by "clear and convincing" evidence and not proof beyond a reasonable doubt.

██ Next, the petitioner asserts that the trial court's judgment is against the manifest weight of the evidence. However, to be against the manifest weight of the evidence, conclusions opposite to those reached by the trial court must be clearly evident to this court. (*First Security Bank of Glendale Heights v. Bawoll* (1983), 120 Ill. App. 3d 787, 458 N.E.2d 193.) Furthermore, this court will not disturb the trial court's finding unless such finding is against the manifest weight of the evidence. *Morelli v. Battelli* (1979), 68 Ill. App. 3d 410, 386 N.E.2d 328.

██ The petitioner argues that the trial court gave too much weight to the estate's expert testimony and not enough weight to her expert testimony. She contends that the estate's expert, Thomas Sinclair, lacked sufficient qualifications to render an opinion entitled to any weight at all. Furthermore, she alleges that Sinclair's opinion was based upon faulty facts and reasoning. Her argument is grounded upon the petitioner's assertion that her experts' qualifications were far superior to those of the estate and, hence, that their testimony must be accepted over that of the estate's expert. However, her argument overlooks the fact that the weight accorded an opinion rendered by an expert must necessarily be viewed in the context of the trial court's determination concerning the relative credibility of all the witnesses and not just that of the expert's credibility.

██ The credibility of witnesses is crucial in paternity actions. (*People ex rel. Reynolds v. Aldridge* (1982), 107 Ill. App. 3d 679, 437 N.E.2d 1268; *People ex rel. Martin v. Presswood* (1980), 85 Ill. App. 3d 975, 407 N.E.2d 770.) Here, the trial judge, as the trier of fact, had the duty to assess the credibility of all witnesses, both expert or nonexpert, to determine the weight to be given their testimony and to draw all reasonable inferences therefrom. See 85 Ill. App. 3d 975, 407 N.E.2d 770.

It is the petitioner's position that the uncontested facts, in conjunction with her expert testimony, support a finding of paternity. Petitioner claims that these uncontested facts are that she and the decedent lived together in decedent's apartment during the last six weeks of his life, that they engaged in sexual relations on a daily basis during that period, that birth control measures were not always taken, and that she did not have sex with any other individual during that period. However, these facts are not uncontested, and, as stated previously, witness credibility is crucial in paternity actions,

and it was the trial court's duty to make this determination. Here, after the trial judge reviewed the evidence, he stated that he did not believe that Colleen McHugh and Edward Lukas were entirely truthful in their testimony, but that he did believe that the witnesses for the estate were telling the truth. These assessments, of course, were entirely proper for the trier of fact to make and were also supported by the record. There was testimony presented at trial which conflicted with the testimony of the petitioner and Edward Lukas and, if believed by the trial court, raised serious questions about petitioner's and Lukas' truthfulness. John Dizzano testified that he had sexual relations with the petitioner during the crucial period, and, while the petitioner denied knowing Dizzano, Joseph Ciancanelli said he saw the petitioner and Dizzano together in a tavern. Jeri Lynn Valle testified that the box of sanitary napkins requested by the petitioner during her stay with Valle was half empty when the petitioner left. Valle also stated that the decedent had told her that both he and the petitioner were dating other people. Additionally, Geraldine Peer testified that the petitioner was flirting with Edward Lukas on the day of the decedent's funeral, and Mary Lukas stated that she saw the petitioner and Edward Lukas kissing and "making out" approximately one month after the decedent's funeral. However, Edward Lukas denied such things happened. Furthermore, Mary Lukas saw none of petitioner's clothing at the decedent's apartment except for a nightgown and robe, although the petitioner claimed that she stored her clothing at the decedent's apartment in one closet and two dresser drawers.

Additionally, there were discrepancies and inconsistencies in the petitioner's testimony. The petitioner delayed giving notice of her change of address to both her employer and her bank, and Edward Lukas admitted that he failed to tell either his parents, his sister or the petitioner about the decedent's alleged statement until well after this litigation was initiated. Accordingly, it cannot be said that the trial court's determination was incorrect since any possible contrary conclusion is certainly not clearly evident from the record here. Furthermore, the trier of fact is not required to believe a complaining witness' statements or testimony in a paternity action merely because they are unrebutted. *People ex rel. Martin v. Presswood* (1980), 85 Ill. App. 3d 975, 407 N.E.2d 770; see *People ex rel. Reynolds v. Aldridge* (1982), 107 Ill. App. 3d 679, 437 N.E.2d 1268.

The petitioner relies heavily on the supreme court case of *People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126, which she claims is similar to the present case. However, we find the

*Baker* case distinguishable from the case before this court. While the plaintiff in *Baker* also testified in her paternity action that she dated no one but the defendant and had sexual intercourse with no one other than the defendant during the critical period, there the defendant himself also testified at trial and admitted he had sexual intercourse with the plaintiff and that neither he nor the plaintiff had used contraceptives. In addition, there was no evidence there that indicated the plaintiff had intimate contact with any other man during the critical period or that raised any question concerning the plaintiff's credibility. The jury in that case, nonetheless, returned a verdict of not guilty, and the trial judge denied the plaintiff's motion for a judgment *n.o.v.*, but the appellate court reversed, and the supreme court affirmed the appellate court. The supreme court held that a jury could not arbitrarily or capriciously reject the testimony of a witness who was not impeached or contradicted and whose testimony was not inherently improbable. 88 Ill. 2d 81, 85, 430`N.E.2d 1126, 1127; see *Bucktown Partners v. Johnson* (1983), 119 Ill. App. 3d 346, 456 N.E.2d 703 (trial judge's rejection of testimony found improper under standard set forth in *Baker*).

However, in the present case, the trial judge, supported by the record here, found a substantial question existed concerning the petitioner's veracity and credibility. Furthermore, the plaintiff in *Baker* was not required to prove paternity by clear and convincing evidence because the putative father there was still living and the standard of proof under those circumstances would be proof by a preponderance of the evidence. Additionally, the defendant there corroborated the plaintiff's testimony on all material issues including the fact of their intimacy and the fact that neither had used contraceptives during intercourse. Here, the putative father was dead, which required the petitioner to meet a higher standard of proof, and the putative father could not, of course, respond to the petitioner's assertions. But, the petitioner's assertions were, in fact, questioned by the testimony of others and the circumstances of the case itself.

■ Furthermore, while the trial court recognized that the petitioner's experts were eminently qualified, their opinions are by no means conclusive, even if there was no question concerning the underlying facts. This court in *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289, 299, in reviewing the decision of a trial court which was confronted with the testimony of numerous experts on an issue, stated:

"Although the number of witnesses for each side is a factor to

be considered, it is not determinative. [Citation.] The conflicting testimony of expert witnesses normally raises an issue uniquely determinable by the trier of fact, who is in a better position to view the pertinent exhibits and assess the credibility of the witnesses. However, the weight of an expert's opinion must be measured by the reasons given for the conclusion and the factual details marshalled in support thereof. [Citation.] The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court [citation], and, where a factual basis is lacking, the opinion is entitled to little weight. [Citation.]"

■ Here, a classic battle of the experts existed on the issues, including the interrelationship of the HLA and GLO markers in paternity testing. King's deposition testimony failed to mention any interrelationship between the GLO and HLA genetic markers. Gebel testified that there actually was a discrepancy between the GLO values associated with the HLA marker shared by the decedent's mother, Geraldine Peer, and Raymond Edward Lukas. While Gebel claimed that this discrepancy did not affect the probability of paternity figure, he admitted he was unqualified to render an opinion on what effect the GLO discrepancy would have on the probability of paternity. Bach testified that no one could state conclusively whether a discrepancy existed in the GLO values, but he admitted that there was a 93% to 98% probability that a discrepancy did, in fact, exist. Bach also stated that a crossover was required if a discrepancy did exist and that a crossover was not a common occurrence. Additionally, both Sinclair and Bach gave conflicting opinions as to the effect a GLO discrepancy, which would require a crossover, had on the probability of paternity figures based solely upon the HLA findings. This conflict in the expert testimony was a matter that was uniquely determinable by the trier of fact. It was entirely proper for the trial court to resolve the conflict in favor of the estate and find that the GLO discrepancy and the corresponding crossover requirement created, at the least, a reasonable doubt concerning paternity. Also, it was appropriate for the trial court to find that this reasonable doubt prevented the petitioner from meeting the standard for proving paternity by clear and convincing evidence. Accordingly, under these circumstances, where there has been conflicting testimony about the events offered by the parties as well as conflicts in the expert testimony itself, we cannot say that a contrary conclusion was clearly evident. Thus, we do not find that the trial court's resolution of the matter was against the manifest weight of the evidence.

■ Finally, it should be noted that courts do not give conclusive effect to blood test results in paternity cases in any event. While blood tests can be used to exclude an individual as the biological father or to include that individual within the class of potential biological fathers, blood tests, including HLA tests, cannot conclusively demonstrate that an individual is, in fact, the father of the particular child. (See *Alinda V. v. Alfredo V.* (1981), 125 Cal. App. 3d 98, 101, 177 Cal. Rptr. 839, 840.) Regardless of whether the HLA test results exclude the defendant as the father of the child (see, *e.g.*, *Aroonsakul v. Flanagan* (1984), 124 Ill. App. 3d 626, 464 N.E.2d 1091) or include him in the class of potential fathers and give a high probability of paternity figure (see, *e.g.*, *Everett v. Everett* (1984), 150 Cal. App. 3d 1053, 201 Cal. Rptr. 351), the parties are, nevertheless, entitled to their day in court to present their evidence and to attack the accuracy of the test results (see *Daubach v. Ishihara* (1981), 103 Ill. App. 3d 750, 431 N.E.2d 1183). Furthermore, the weight accorded an expert's probability of paternity figure is necessarily affected by the trier of fact's assessment of certain factual assumptions made by the expert in calculating the probability of paternity. (See *Everett v. Everett* (1984), 150 Cal. App. 3d 1053, 1069-70, 201 Cal. Rptr. 351, 361.) Thus, contrary to the petitioner's assumption in her argument here, expert testimony under any circumstance is never conclusive. Accordingly, in any event, it is ultimately for the trial judge, as the trier of fact, to determine if the petitioner had proved paternity.

For the above stated reasons, we find that the trial court's determination that the petitioner failed to prove paternity by clear and convincing evidence is not against the manifest weight of the evidence and was a proper determination here. Hence, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.