# Illinois Official Reports

## Appellate Court

---

### *John Crane Inc. v. Allianz Underwriters Insurance Co.*,
### 2020 IL App (1st) 180223

---

| | |
|---|---|
| Appellate Court Caption | JOHN CRANE INC., Plaintiff-Appellant, v. ALLIANZ UNDERWRITERS INSURANCE COMPANY; ALLSTATE INSURANCE COMPANY, as Successor-in-Interest to Northbrook Insurance Company; AIU INSURANCE COMPANY; CENTURY INDEMNITY COMPANY, as Successor to CCI Insurance Company, as Successor to Insurance Company of North America; COLUMBIA CASUALTY COMPANY; CONTINENTAL CASUALTY COMPANY; CONTINENTAL INSURANCE COMPANY as Successor-in-Interest to London Guarantee and Accident Company of New York; GRANITE STATE INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; MUNICH REINSURANCE AMERICA, INC., as Successor-in-Interest to American Excess Insurance Company; NATIONAL SURETY CORPORATION; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; TIG INSURANCE COMPANY, as Successor-in-Interest to International Insurance Company, Solely with Respect to Excess Liability Policy Number 5220294939; and WESTCHESTER FIRE INSURANCE COMPANY, as Successor-in-Interest to International Insurance Company, Solely with Respect to Excess Liability Policy Number 5220287136, Defendants (Century Indemnity Company and Westchester Fire Insurance Company, Defendants-Appellees). |
| District & No. | First District, Sixth Division<br>No. 1-18-0223 |
| Filed | June 12, 2020 |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CH-08266; the Hon. Moshe Jacobius, Judge, presiding. |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Stephanie A. Scharf, Deirdre A. Fox, and George D. Sax, of Scharf Banks Marmor LLC, of Chicago, and William G. Passannante, Cort T. Malone, and Dennis J. Nolan, of Anderson Kill P.C., of New York, New York, for appellant.<br><br>Michael R. Orlando, of Cohn Baughman & Martin, of Chicago, for appellees. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Cunningham concurred in the judgment and opinion.<br>Presiding Justice Mikva concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1    Plaintiff, John Crane Inc. (JCI), appeals from various pretrial judgments of the circuit court, as well as its order finding that JCI had not proved exhaustion of its primary insurance policies. On appeal, JCI contends (1) the trial court erred in determining as a matter of law that the first primary umbrella policy had a $60 million per occurrence limit instead of a $20 million limit, (2) the trial court's finding that JCI did not prove exhaustion was against the manifest weight of the evidence, and (3) the trial court erred in denying JCI's motion for a new trial. For the following reasons, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3    On December 28, 2017, the trial court entered its order after a trial. The court declared its order final and appealable on January 26, 2018. JCI filed its notice of appeal on January 29, 2018. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                    II. BACKGROUND

¶ 5    The following facts provide a general background of the case leading up to this appeal. We elaborate on certain facts in our analysis as they pertain to the issues raised by JCI.

¶ 6    Prior to 1986, JCI used asbestos fiber in manufacturing gaskets, mechanical sealing, and packing products. As of February 2017, JCI has been named a defendant in over 325,000 cases

claiming exposure to its asbestos-containing products. JCI obtained primary insurance coverage from Lumbermens Mutual Insurance Company and American Motorists Insurance Company (hereinafter referred to collectively by their trade name, Kemper), as well as umbrella and excess coverage from defendants. In May 2004, JCI filed a claim for declaratory judgment that Kemper's primary coverage was exhausted and also sought a declaration of the obligations of its umbrella and excess insurance carriers. JCI subsequently entered into a settlement agreement with Kemper, and from that point, it "[stood] in the shoes of Kemper" regarding any obligations Kemper would have had under the primary policies.

¶ 7    An exhaustion trial was held, and the trial court found that JCI did not prove that the Kemper primary policies had been exhausted by the claims at issue. On appeal, this court determined, among other things, that (1) JCI must prove that all of Kemper's primary policy limits were exhausted before it can seek coverage under its umbrella or excess policies (horizontal exhaustion); (2) under the supreme court case of *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), a policy may be triggered upon proof of exposure, sickness, or disease, but proof of all three triggers is not required; and (3) the equitable continuous trigger did not apply. This court remanded the cause for an exhaustion trial consistent with our opinion. A complete background and analysis of the case can be found in *John Crane Inc. v. Admiral Insurance Co.*, 2013 IL App (1st) 093240-B.

¶ 8    Prior to the second exhaustion trial, the trial court considered numerous pretrial motions. Relevant to this appeal, defendants filed a motion for summary judgment regarding three multiyear Kemper umbrella policies. The policies each covered approximately a three-year period. On each policy, the occurrence limit was $20 million, and the aggregate limit was $20 million. Defendants claimed that the per occurrence limits for the three policies were annualized and thus totaled $180 million. The court granted the motion as to the first umbrella policy only, relying on the statement in endorsement 3 of the policy that the "limits of the company's liability shall apply separately to each such consecutive period." The other umbrella policies did not contain such language. Therefore, the court determined that the per occurrence limit on the first umbrella policy was $60 million for the three-year policy period and that the limit for the other two policies remained at $20 million for a total of $100 million. The trial court also found that the Kemper umbrella policies "do not contain 'other insurance' provisions."

¶ 9    The court conducted a 23-day bench trial on whether the 141 claims JCI had paid in underlying asbestos personal injury cases exhausted the Kemper primary policies. The parties stipulated that the Kemper primary policies have a total limit of $41,075,000. JCI presented Ross Mishkin as an expert in claim analysis and allocation. Mishkin concluded that the primary policies were exhausted in February 2008 as a result of JCI's payment on claim number 76 of the 141 claims. Although the court qualified Mishkin as an expert, it ultimately found his method of allocation problematic. Mishkin did not always follow his own allocation rules, and he improperly "banked" claims.

¶ 10    The trial court further found that, even if it accepted Mishkin's allocations, Mishkin committed error in determining the trigger dates of six claims totaling $16,805,941. Mishkin testified at trial that, if even one claim were removed from his analysis, his allocation "would no longer demonstrate that the primary policies were exhausted." He also stated that, if any of the claims were misallocated, he would have to redo his allocation. "Therefore, by Mr.

Mishkin's own admission, the Court's conclusion that six of the claims were misallocated means his allocation no longer demonstrates that the primary policies were exhausted."

¶ 11 The trial court denied JCI's request for a new trial, and JCI filed this timely appeal. After filing the appeal, JCI entered into a settlement agreement with the AIG Companies, consisting of defendants AIU Insurance Company, Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA. As a result, the appeal was dismissed as to those defendants. Century Indemnity Company and Westchester Fire Insurance Company remain as defendants and appellees.

¶ 12                                              III. ANALYSIS

¶ 13 On appeal, JCI first challenges the trial court's interpretation of the per occurrence limit in the first Kemper umbrella policy. A court's primary objective in construing an insurance policy is to give effect to the parties' intent as expressed by the language of the policy. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). As with any contract, an insurance policy must be construed as a whole, giving effect to every provision if possible. *Id.* If the policy's words are clear and unambiguous, "they must be given their plain, ordinary, and popular meaning." *Id.* However, "[i]f the policy language is susceptible to more than one reasonable meaning, it is considered ambiguous and will be construed against the insurer." *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 393 (2005). We review the trial court's interpretation of an insurance policy *de novo. Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 370-71 (2007).

¶ 14 The declarations page of the first Kemper umbrella policy shows a policy period from "12-1-67" to "12-1-70." The page also states: "Occurrence Limit: $20,000,000" and "Aggregate Limit: $20,000,000." Under the "Limits of Liability" section, the policy provides that:

> "the total limit of the company's liability for any one occurrence shall be the ultimate net loss resulting therefrom in excess of the underlying limit and then only up to the amount stated in the declarations as the occurrence limit; provided, however, the company's liability is further limited to the amount stated in the declarations as the aggregate limit, with respect to all ultimate net loss resulting from one or more occurrences during each annual period while this policy is in force ***."

The policy was subsequently amended by two endorsements relevant to this appeal. Endorsement 1 added two months to extend the policy period to "2-1-71." Endorsement 3 stated:

> "It is agreed that the policy period is comprised of the following three consecutive periods:
>
> > From 12-1-67 to 2-1-69;
> > From 2-1-69 to 2-1-70;
> > From 2-1-70 to 2-1-71;
> > * * *
>
> The limits of the company's liability shall apply separately to each such consecutive period."

¶ 15 JCI acknowledges that the aggregate limit of the first Kemper umbrella policy is $20 million per year, where the limits of liability section refers to the aggregate limit "during each

- 4 -

annual period while this policy is in force." However, JCI contends that the trial court erred in finding that the occurrence limit in the policy was also $20 million per year.

¶ 16    JCI argues that the limits of liability section shows an intent to apply only the aggregate limits annually and that the language in endorsement 3 merely clarifies that point. JCI points to endorsement 1, which added two months to the policy period. Since the first of the three periods in endorsement 3 incorporated the extra 2 months, that period is actually 14 months rather than one year. Endorsement 3's statement that the company limits "apply separately to each such consecutive period" is only meant to clarify that the annualization of the aggregate limits also applies to this 14-month period. The per occurrence limit, JCI argues, should be left "as originally written." As support, JCI cites *CSX Transportation, Inc. v. Commercial Union Insurance Co.*, 82 F.3d 478 (D.C. Cir. 1996); *Greene, Tweed & Co. v. Hartford Accident & Indemnity Co.*, No. 03-3637, 2006 WL 1050110 (E.D. Pa. Apr. 21, 2006); an unreported case from the Eastern District of Pennsylvania; and *Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland, Ltd.*, 750 F. Supp. 1375 (N.D. Ill. 1990).

¶ 17    These cases do not support JCI's position. In *Board of Trustees*, the court determined that the term "aggregate" in the policy, without more, was unambiguous and signified the application of aggregate limits over the duration of the policy. *Board of Trustees*, 750 F. Supp. at 1380. There was no issue as to the occurrence limits. The other cases interpreted language similar to the limits of liability provision in the policy here and found that the occurrence limits therein applied over the entire duration of the multiyear policies. *CSX*, 82 F.3d at 483; *Greene*, 2006 WL 1050110, at *10. However, neither policy included a subsequent endorsement amending the original policy.

¶ 18    In a partial dissent, our colleague agrees with JCI that endorsement 3 was clearly "intended to explain how that stub period would be treated in terms of the annual aggregate policy limits." However, the fact remains that nowhere in endorsement 3 is there a reference to aggregate limits or any other specific limit. The policy's original limits of liability provision addressed two types of limits: occurrence and aggregate. Endorsement 3, which the parties agree amended the original policy, sets forth three distinct, consecutive periods, consisting of approximately one year each, and clearly states that the "limits of the company's liability shall apply separately to each such consecutive period." Endorsement 3 makes no distinction between the two types of limits. For this reason, other courts have construed this same language to mean that " 'the limits of the company's liability' may be applied separately" to each period of coverage and that both aggregate and occurrence limits are implicated. See *Security Insurance Co. of Hartford v. Lubrizol Corp.*, No. 1:06-CV-215, 2009 WL 10676776, at *11-12 (E.D. Tex. Aug. 27, 2009).

¶ 19    If endorsement 3's limits of liability language was intended to apply only to the policy's aggregate limits, that intent should have been made clear where the original provision addressed two different types of limits. Although we find the language of endorsement 3 to be clear and unambiguous, our colleague's finding that JCI's interpretation is a reasonable one only demonstrates that the statement in endorsement 3 may be susceptible to more than one reasonable interpretation. "[I]f the terms of the policy are susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy" (or in this case JCI, who stepped into the shoes of Kemper). *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997). For these reasons, we affirm the

trial court's determination that the per occurrence limit for the first Kemper umbrella policy is $20 million for each consecutive period, or $60 million for the entire policy period.[1]

¶ 20    JCI next contends that the trial court erred in finding Mishkin's methodology and allocations not credible. Since Mishkin's testimony was necessary to demonstrate exhaustion of the primary policies, the court found that JCI failed to prove exhaustion. As the trier of fact, the trial court assesses the credibility of all witnesses, including expert witnesses, and determines the weight to be given their testimony. *In re Estate of Lukas*, 155 Ill. App. 3d 512, 521 (1987). "The value of expert testimony depends upon the facts and reasons which form the basis of the expert's opinion." *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 402 (2010). Even where the experts are "eminently qualified," the trial court need not take their opinions as conclusive on the matter. *Lukas*, 155 Ill. App. 3d at 523. We will not disturb the trial court's findings regarding witness testimony unless they are against the manifest weight of the evidence. *Id.* at 521. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.*

¶ 21    The trial court, in its 140-page order, thoroughly addressed Mishkin's allocation testimony. First, it found that Mishkin failed to follow his own protocol. Mishkin testified that, if there was a "toss up" between dates when determining a trigger date for a claim and no distinguishing feature allowed him to choose one date over the other, he would use the more restrictive or shorter trigger period. The court pointed to the Bildstein claim, in which Mishkin used a sickness trigger date of January 1, 1995, based on Bildstein's testimony that he began experiencing symptoms in the mid-1990s. However, Bildstein failed to identify any symptoms he was experiencing during that time. In fact, records showed that Mr. Bildstein's cancer was detected accidentally, and "unusually early," during a routine X-ray for rotator cuff surgery in August 1999. Bildstein also contradicted himself by stating that, before discovering the cancer, he was "in good health" and had no physical limitations or restrictions on his activities. Furthermore, a reviewer on Mishkin's staff noted that "Mr. Bildstein may be incorrect in his recollection of sickness" because the records showed the cancer was detected at an unusually early stage in 1999. The trial court found that "Mishkin's determination that this claim should not even be identified as a 'toss up' in which there are conflicting sickness dates defies logic."

¶ 22    Mishkin also testified that, if a claimant changed jobs, he would create separate exposure periods and confirm that the claimant was exposed to a JCI asbestos-containing product during each exposure period. For the Oney claim, Mishkin allocated more than $5 million to Kemper primary policies based on a continuous exposure period from 1963 to 1994. Oney, however, changed jobs throughout that period, and from 1990 to 1994, there was no evidence that Oney was exposed to JCI asbestos-containing product. Oney stated in his affidavit that he worked on the *USS Enterprise* from 1990 to 1994 and was "around tradesm[e]n installing and tearing out asbestos containing products." The trial court noted that Oney never referenced JCI

---

[1]JCI also argues that the trial court erred in finding that the Kemper umbrella policies do not contain an "other policies" provision. This issue was decided in favor of other defendants who have since settled with JCI and are no longer parties to this appeal. The parties agree that this issue does not affect remaining defendants Century Indemnity Company and Westchester Fire Insurance Company. Therefore, the issue on appeal is moot. See *People v. Johnson*, 225 Ill. 2d 573, 595 (2007) (Burke, J., dissenting) ("[a]n appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief").

products or that he worked directly with asbestos-containing products during that time. The court found Mishkin should not have allocated the Oney claim to policies in effect from 1990 to 1994.

¶ 23 JCI argues that the trial court erred in declining to give more weight to Bildstein's testimony that he experienced symptoms in the mid-1990s. Regarding the Oney claim, JCI argues that, since Mishkin's trigger dates are based on reasonable inferences in the record, JCI met the preponderance of the evidence standard and that the court erred in disallowing the claim. The trial court is not required to accept an expert's conclusion if it finds his methodologies are unsound. *Kane v. Motorola, Inc.*, 335 Ill. App. 3d 214, 222 (2002). The court found Mishkin's methodology problematic and, as a result, determined that Mishkin erred in allocating these claims to the primary policies. We cannot say that the opposite conclusion is clearly evident. Therefore, the trial court's determination was not against the manifest weight of the evidence.

¶ 24 JCI also disputes four other claims in which the trial court found Mishkin's assignment of a trigger date erroneous. However, since we have upheld the trial court's determination on the Bildstein and Oney claims, review of the four claims is not necessary. As the trial court noted, Mishkin testified at trial that, if even one claim was removed from his analysis, his allocation "would no longer demonstrate that the primary policies were exhausted." He would have to redo his allocation if any of the claims were misallocated. The trial court's determinations on the Bildstein and Oney claims alone would mean, as acknowledged by Mishkin, that he could no longer demonstrate exhaustion of the primary policies.

¶ 25 Furthermore, the trial court not only found Mishkin's allocations on those six claims erroneous, it also found Mishkin's overall methodology "problematic" for a number of reasons. First, neither Mishkin nor anyone at his group reviewed all the documents in the claim files. Mishkin initially received one million documents pertaining to the 141 claims at issue. Later, he was provided with two million additional documents pertaining to claims 68 through 141. Rather than review all two million additional documents, Mishkin testified that he fully reviewed the additional documents for eight of the claims to determine whether the documents would impact his trigger dates. Mishkin found that the additional documents were duplicative and did not affect his trigger dates. Therefore, he concluded that a complete review of the two million documents was unnecessary.

¶ 26 The trial court found that Mishkin's "fail[ure] to look at approximately two-thirds of the documents in the case greatly harms the reliability and credibility of [his] allocation." The court noted that Mishkin only reviewed 8 of the 74 claims for which additional documents were provided, which "is an extremely small percentage of the claims to rely upon" in reaching his conclusion. The court also noted that "each claim is unique" and found Mishkin's decision to use a small percentage of claims to make a conclusion as to all 74 claims unjustified. Mishkin's use of the "toss up" when there is an unresolvable conflict between trigger dates in the case file "is only possible when all the documents are reviewed to determine if a conflict exists." The trial court found "the fact that Mr. Mishkin determined it was appropriate to make trigger determinations without specifically reviewing two-thirds of the documents not only damages the credibility of the trigger determinations for claims 68 through 141, it also casts doubt on Mr. Mishkin's judgment and overall methodology."

¶ 27 JCI argues that there is no authority to support the trial court's determination that an insurance expert must inspect every document. It warns that this rule would place an onerous

burden on policyholders who must pay an expert for review of millions of pages of documents to evaluate exposure and sickness trigger dates. JCI contends that other courts have allowed statistical sampling in asbestos claims to establish triggers and coverage, citing federal cases *UNR Industries, Inc. v. Continental Casualty Co.*, 942 F.2d 1101 (7th Cir. 1991), and *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 829 F.2d 227 (1st Cir. 1987).

¶ 28     Although these cases endorsed the use of statistics in analyzing asbestos claims, they also indicated that a case-by case analysis may be preferable. In *UNR*, the Seventh Circuit considered whether the insured must prove the allocation of asbestos claims on a case-by-case basis or whether use of statistical analysis would suffice. The court noted that, under the federal rules, the admissibility of statistical evidence would depend "on the qualifications of the person who presents it" and "whether the basis for the evidence is of a type reasonably relied on by experts in the field." *UNR*, 942 F.2d at 1107. The Seventh Circuit did not conclude that only a case-by-case analysis of asbestos claims is sufficient to prove allocation. Rather, the policyholder "has the right to present whatever types of proof it thinks appropriate *** and have that proof evaluated for admissibility and persuasiveness when presented." *Id.* The court cautioned, however, that "statistics may be less persuasive than evidence of each individual case." *Id.* In relying solely on statistical data, "a party risks losing a case that it could have won by going to the expense of more specific proof. But that risk is [the policyholder's] to take if it finds appropriate." *Id.*

¶ 29     In *Eagle-Picher*, the district court endorsed a six-year rollback, in which the date triggering insurance coverage was deemed to be six years before diagnosis. *Eagle-Picher*, 829 F.2d at 232. The district court found this method preferable to an individualized file review, in part, because it believed that a case-by-case review would impose significant time and financial burdens on the insured. *Id.* at 236. Although the First Circuit found no error in using the method, it determined that the district court did err "in rejecting entirely the concept of an individualized review." *Id.* It reasoned that, "if one can determine with reasonable accuracy when an individual was capable of diagnosis by scrutinizing his medical records, such a scrutiny is preferable to the use of a statistical model that is more likely than not to designate the wrong date for that individual." *Id.* Sole use of statistical analysis may be appropriate where there is no detailed information on any claimant. *Id.* at 237. However, where detailed medical information exists, a statistical model should be given "only presumptive impact," and the insurer may show that the trigger date of a particular case falls outside the policy period. *Id.*

¶ 30     We agree with *UNR* and *Eagle-Picher* that statistical analysis may be used in allocating asbestos claims. The trial court here, however, did not reject the use of statistical analysis outright. Rather, it found that, given the wealth of information provided to Mishkin, a case-by-case analysis using all the documents would produce more accurate determinations. As the courts in *UNR* and *Eagle-Picher* found, a case-by-case analysis for asbestos claims, if feasible, is preferable because it results in a more accurate determination of a trigger date. Furthermore, the courts in *UNR* and *Eagle-Picher* accepted the statistical models used therein. The trial court below expressly rejected Mishkin's method of fully reviewing the documents of only 8 claims to determine that the additional two million documents were duplicative for all 74 claims. The court questioned Mishkin's reliance upon "an extremely small percentage of the claims" in reaching his conclusion. If Mishkin had utilized a statistical model that sufficiently incorporated the documents of all 74 claims, the trial court may have accepted that method.

¶ 31    The trial court also found that Mishkin's allocation was "fundamentally flawed" because he improperly "banked" claims and used a "general Navy I.D." to determine exposure dates. Although he could have allotted some claims to a primary policy or an earlier umbrella policy, Mishkin chose to reserve, or bank, a portion of or the full claim payment until the primary policies and earlier umbrella policies were exhausted. Mishkin testified that banking was an appropriate allocation method, which he had used in other cases. Although he referenced one case where he used a "similar approach," the trial court distinguished that case because it used a *pro rata* approach to allocation rather than the all-sums approach applicable here. Mishkin acknowledged that the cases in which he has testified did not address whether banking was an appropriate allocation method. He also acknowledged that, while he looked for literature on the use of banking to allocate insurance claims, he found none.

¶ 32    Defendants' expert witness, Dr. Denise Martin, testified that she had never heard of the practice of banking claims and she had never banked a claim. She also could not find any literature on the issue. She knew of no other expert who banked claims and did not believe that the method Mishkin used comported with standard practices in the insurance field. Dr. Martin was never asked to allocate claims in any way other than by payment order.

¶ 33    The court found Dr. Martin's testimony that the practice of banking does not "comport with the standards in the insurance allocation field" more credible. In footnote 12 of its brief, JCI contends that the trial court in a prior ruling actually found the banking method proper. We disagree. The trial court found it was unclear at the time whether the banking method properly applied horizontal exhaustion and that a "[q]uestion of fact regarding whether Mishkin's allocation methodology is accepted in the industry and produces a fair result remain[s]." At trial, the testimony on the banking issue became a classic battle of the experts. The trial court, as factfinder, listened to the conflicting testimony and used its judgment to make a determination. In this situation, the factfinder is in a better position to assess the credibility of the witnesses and give weight to each expert's opinion, as measured by the reasons given for the conclusion along with the supporting facts. *Lukas*, 155 Ill. App. 3d at 524. This court will not substitute our judgment for that of the trial court in determining the credibility of expert witnesses. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 39.

¶ 34    Regarding the general Navy I.D., Mishkin testified that, if a claimant served in the Navy or a Navy-related job and worked with gaskets or packing, he used the I.D. to determine that the claimant was exposed to JCI's asbestos-containing products. JCI argues that Mishkin used a proper methodology because "JCI had a national footprint and was a significant supplier to the U.S. Navy, and its products were used in a widespread manner throughout naval vessel construction, maintenance, and operation." The trial court determined, however, that Mishkin's reliance on the general Navy I.D. was "misplaced" because he "was aware that JCI was not the Navy's exclusive distributor of gaskets and packing." Since there were "many suppliers who provided the Navy with the same types of asbestos containing products as JCI," the court found that "simply knowing that an individual worked with gaskets and packing during his or her time in the Navy is insufficient to conclude that the claimant was exposed to JCI's asbestos containing products." As such, there was no foundation for Mishkin's determination that everyone who was in the Navy and worked with gaskets or packing was exposed to JCI's products. The trial court concluded that "Mishkin's use of the general 'Navy I.D.' casts doubt on his credibility and judgment."

¶ 35    For these reasons, the trial court found that

"Mr. Mishkin's methodology and allocation is [*sic*] not credible and cannot be given weight. \*\*\* Due to Mr. Mishkin's frequent failures to follow his own protocol, decision to 'bank' claims, reliance on the general 'Navy ID,' and failure to review two-thirds of the documents concerning the underlying claims, the Court cannot rely on Mr. Mishkin's allocation. Since Mr. Mishkin's allocation was necessary for JCI to demonstrate that it had exhausted all of the primary policies, JCI has not met its burden of demonstrating that the Primary Policies are exhausted."

An expert's opinion is only as valuable as the facts and reasons on which it is based. *Iaccino*, 406 Ill. App. 3d at 402. The trial court's determination was not against the manifest weight of the evidence.

¶ 36 JCI's final contention is that the trial court erred in denying its motion for a new trial. JCI argues that Mishkin's exhaustion analysis stopped in February 2008 at claim 76 of the 141 claims. Without a new trial, JCI has no way "to establish that any of claims 77 through 141 exhausted the Kemper Primary Policies at a later time than February 2008." JCI contends that a new trial using proper allocation methods as set by the trial court would establish exhaustion "once and for all."

¶ 37 A new trial is warranted when the trial court's errors substantially prejudiced a party and affected the outcome of the trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002). "This is especially true where the exclusion of evidence deprives a party of the opportunity to prove its theory of the case." *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020, 1041 (2002). A reviewing court will not reverse the trial court's determination on a motion for a new trial absent an abuse of discretion. *Gersch v. Kelso-Burnett Co.*, 272 Ill. App. 3d 907, 908 (1995).

¶ 38 Here, we have determined that the trial court did not err in the rulings challenged by JCI. Therefore, we have no basis on which to order a new trial. Also, JCI does not claim that it was deprived of the opportunity to analyze claims 77 through 141 in the underlying proceedings. Rather, Mishkin stopped his analysis at claim 76 because, using his methods of allocation, he concluded that the primary policies were exhausted as a result of JCI's payment on that claim. JCI has already had two lengthy exhaustion trials and now requests a third one to prove exhaustion "once and for all" with the remaining claims not analyzed by Mishkin. A motion for a new trial cannot be used by JCI to get a third bite of the apple, to try again with the knowledge of strategies that did not succeed at trial. The trial court's denial of JCI's motion for a new trial was not an abuse of discretion.

¶ 39 IV. CONCLUSION

¶ 40 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 41 Affirmed.

¶ 42 PRESIDING JUSTICE MIKVA, concurring in part and dissenting in part:

¶ 43 I agree with the majority that the trial court's finding that JCI did not prove exhaustion was not against the manifest weight of the evidence and that the trial court did not abuse its discretion in denying JCI a new trial. I disagree, however, with the interpretation by the trial court and my colleagues of the occurrence limits of the first Kemper umbrella policy. Unlike the other two issues raised in this appeal, our standard of review on this question of insurance

policy interpretation is *de novo*. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292-93 (2001).

¶ 44   We must start with the approach that an insurance policy, like any contract, is to be construed as a whole, with our primary objective being to ascertain and give effect to the intentions of the parties. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). Our obligation to construe the policy as a whole includes the endorsements, which in this policy explicitly state that they were "subject to the declarations, conditions, and other terms of the policy which are not inconsistent herewith."

¶ 45   In my view, the unambiguous language of the policies, when read in conjunction with the endorsements, makes clear that the occurrence limits for each of the three Kemper umbrella policies were $20 million for the life of each policy. This would mean that the total occurrence limit for the three Kemper umbrella policies that JCI was required to exhaust before accessing the other policies at issue on this appeal was $60 million, rather than $100 million.

¶ 46   All three of the Kemper umbrella policies had an occurrence limit of $20 million and also an aggregate limit of $20 million. Each policy made clear how these two limits were to act together:

> "*the total limit of the company's liability for any one occurrence shall be* the ultimate net loss resulting therefrom in excess of the underlying limit and then only *up to the amount stated in the declarations as the occurrence limit* provided, however, *the company's liability is further limited to the amount stated in the declarations as the aggregate limit*, with respect to all ultimate net loss resulting from one or more occurrences during each annual period while this policy is in force." (Emphases added.)

¶ 47   The trial court found—and it seems, to me, to be beyond dispute—that this policy language provided for a total *occurrence* limit of $20 million for the life of the policy that was further limited by three separate *aggregate* limits of $20 million per year. However, the trial court also found, and my colleagues agree, that this was not true for the first Kemper umbrella policy because of the endorsements. The trial court and my colleagues rely on endorsement 3, which they contend changed the policy such that an ambiguity existed. Based on this alleged ambiguity, the trial court and my colleagues believe that the first Kemper umbrella policy provided for three separate occurrence limits of $20 million each for a total occurrence limit of $60 million for the life of the policy. In my view, this interpretation takes one word in endorsement 3 out of context and completely ignores the clear intended impact of the policy and the endorsement.

¶ 48   On March 19, 1969—about 16 months into the initial 3-year policy period—Kemper and JCI added two relevant endorsements to the first Kemper umbrella policy. Endorsement 1, in relevant part, states that "in consideration of an additional premium of $1,190.00, Item 2 of the Declarations Policy Period Expiration is amended to read 2-1-71." *Id.* Endorsement 1 thus altered the policy period from an exact, 3-year period to a 38-month period that could not be divided into three equal annual periods.

¶ 49   Endorsement 3—which is the endorsement that the trial court and my colleagues believe expanded the total occurrence limit by threefold—then broke down the 38 months of the policy into three periods—one 14-month period and two 12-month periods—to take the place of the annual periods that had been in the policy before endorsement 1 added the 2 additional months. Endorsement 3 stated that these three periods would run from "12-1-67 to 2-1-69," from "2-1-69 to 2-1-70," and from "2-1-70 to 2-1-71" and included this language, which the trial court

and my colleagues rely on: "The *limits* of the company's liability shall apply separately to each such consecutive period." (Emphasis added.) The majority concludes that because the word "limits" is plural, it is possible that the parties intended to have both the aggregate and the occurrence $20-million limits apply to each consecutive period.

¶ 50    But when these endorsements are read together with the language of the policy itself, it is clear to me that the plural use of "limits" in endorsement 3 refers to the interrelated "limits" on aggregate liability and occurrence liability. Thus, while the occurrence liability limit was impacted by endorsement 3 to the extent that the policy was now in place for 38, rather than 36, months and the aggregate limit, which operated to further limit the occurrence limit, now ran for a slightly different time period, the occurrence limit for the policy was not tripled by this endorsement. Nothing in this endorsement suggests that it was intended to have such a dramatic impact on the policy limits. And the fact that endorsement 1 specifically states that the additional two months that were added came with a price tag of less than $2000 confirms that these endorsements were intended to make a minor change rather than to triple the occurrence limit of the policy. Looking at the plain language of the endorsements, it is obvious that endorsement 1 was intended to add a two month "stub period" to the policy and that endorsement 3 was intended to explain how that stub period would be treated in terms of the annual aggregate policy limits.

¶ 51    My colleagues recognize that this is a "reasonable" reading of the endorsements. They nonetheless contend that the use of the plural "limits" in endorsement 3 makes that endorsement ambiguous and that therefore the court must construe the policy against the drafter in a manner that triples the policy occurrence limit. However, construing an ambiguous policy against the drafter does not mean finding an ambiguity where none exists. Rather, our supreme court has repeatedly emphasized that "an insurance policy must be considered as a whole; all of the provisions, rather than an isolated part, should be examined to determine whether an ambiguity exists." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). When this policy, with these endorsements, is considered together, it is clear to me that no ambiguity exists and there was no basis for the trial court's construction of the policy as including an occurrence limit of $60 million. On that issue, therefore, I respectfully dissent.